IN

# THE SUPREME COURT

OF

## PENNSYLVANIA.

### EASTERN DISTRICT—PHILADELPHIA 1870.

## Angier *versus* Angier.

1. In divorce for wilful and malicious desertion and absence from the habitation without reasonable cause for two years, the applicant must establish each of these ingredients as elements necessary to constitute desertion within the meaning of the Act of March 13th 1851.

2. Whatever may be the grounds the libellant must, by his oath, make it appear to the court that for that cause alone a divorce is claimed.

3. If it should be shown that the application is not based on the grounds stated, but that the causes are set out to advance a scheme to make out a technical case, the court will not permit it to be successful.

4. A husband, in the absence of his wife, broke up housekeeping and proposed to her to go boarding, which she declined. In proceedings in divorce against her for desertion, she might show that this had been done with a view to put himself in a position to claim a divorce.

5. The husband could not claim a divorce based on his own schemes to promote it: this would be taking advantage of his own wrong.

6. The court rejected evidence by the respondent: " of a series and frequent repetition of humiliating and insulting language and opprobrious epithets, applied by libellant to respondent in the presence of her servants." *Held* to be error.

7. The evidence was pertinent as to the motives of the libellant in breaking up housekeeping, and to show that his object was to force the respondent to refuse joining him at a boarding-house.

8. This inference might be drawn by the jury from the evidence and would present a case of fraud on the law and on the respondent which would prevent a divorce.

9. Fraud will defeat a party practising it to obtain a divorce, as in every other case.

10. Courts will protect a wife against the fraud of her husband as well as against his force and violence.

[Angier v. Angier.]

11. A wife may show that her refusal to follow him was to avoid his schemes to get rid of her and not through wilfulness or malice.

12. Great latitude is allowed in an issue of fraud or where it may be alleged and is material to be proved.

13. A libellant may require from respondent beforehand notice of special matters to be proved.

14. The Act of Assembly provides for a jury in divorce only when either party desire a matter of fact affirmed by one and denied by the other, so to be tried.

15. On an appeal in a divorce case which had been tried before a jury on libel, answer and proof, it is before the Supreme Court as if no jury had sat.

16. In such case where there is a decree of divorce, if the record shows that the appellee was not entitled to a decree on the merits, the Supreme Court will dismiss the bill and not send it back to be retried.

17. A party to succeed in divorce must be clear of everything which is charged against the opposite party as a cause of separation.

January 7th 1870. Before THOMPSON, C. J., READ and SHARSWOOD, JJ. AGNEW, J., at Nisi Prius. WILLIAMS, J., absent.

Appeal from the decree of the Court of Common Pleas of Philadelphia, No. 122, to January Term 1870.

On the 15th of June 1867, William R. Angier presented his libel in divorce to the Court of Common Pleas of Philadelphia, averring his marriage on the 1st of June 1859, with Mary Jane Angier, and their cohabitation until November 2d 1866, and that from that day "she hath wilfully and maliciously deserted and absented herself from the habitation of this libellant without any just or reasonable cause, and still has continued and persisted in such desertion from that time to the present, a term of six months and upwards, and still doth continue to absent herself from the said libellant," &c. He prayed the court to " decree a divorce and separation from the said nuptial ties, or bonds of matrimony heretofore uniting, as above mentioned, this libellant to and with the said Mary Jane Angier."

There was offered an affidavit of the truth of the statements, and " that the said complaint is not made out of levity, or by collusion between the said husband and wife and for the mere purpose of being freed and separated from each other, but in sincerity and truth for the causes mentioned in the said petition."

The libellant answered, admitting the marriage, and added :—

" Yet this respondent doth expressly deny the charge of having maliciously and wilfully deserted and absented herself from him the said William R. Angier, as is stated in the libel of the said William R. Angier ; but this respondent doth aver that the said William R. Angier hath maliciously deserted this respondent.

" All which matters and things this respondent is ready to verify, to maintain and prove, and humbly pleadeth the same in bar to the libel of the said William R. Angier, which she prays may be dismissed, &c."

[Angier *v.* Angier.]

On the libel and answer without further proceedings, the case went to trial, May 10th 1869, before Pierce, J., when the libellant gave in evidence the following letters :—

"Philadelphia, August 29th 1866.

Mrs. Angier :

I have rented my house No. 2031 Walnut street, Philadelphia, and, as you are already advised, intend to take boarding for you and myself.   I will inform you of the place in a day or two.

As the furniture in the house is yours I wish you either to have it all removed together with all your personal property on the premises, or give me the necessary orders as to what disposition you desire me to make of it.

Yours truly,                    WM. ROTCH ANGIER."

"August 29th 1866.

Your letter of this date is received.   I earnestly protest against your pursuing the course that you are threatening me with.

Yours,

Mr. Angier.                              M. J. ANGIER."

"Philadelphia, August 30th 1866.

Mrs. Angier.

I have taken rooms and board for you and myself at Mrs. Neilson's, N. W. corner of Broad and Locust streets.   On Monday next they will be ready for occupancy.

Please have the furniture belonging to you removed from 2031 Walnut street as soon as possible, or give me such directions as may be necessary about it.   There are certain articles about the house belonging to me which I will remove.

Yours truly,                    WM. ROTCH ANGIER."

"Your letter of 30th is received with mingled surprise and pain that you should offer to take me to a boarding-house when for weeks and weeks previous to my going to Newport you never spoke one word to me.   Have you not also said that you considered it impossible for us to agree, and with this before me am I to be taken where strangers can be witnesses to the treatment that I have so long been subjected to ?   I can conceive no reason why I should be exposed to this additional humiliation, particularly as my father had offered you that he would guaranty you against every claim for my maintenance, support and expenses of every sort if I remained where we have been for years, and you declined the arrangement.

"Some days ago I came from Newport (where I have been, and may continue staying at my brother's without a dollar's expense to you), and, in pursuance of arrangements, intend returning on

[Angier v. Angier.]

Saturday ready to return to you whenever you express a wish to that effect and provide for me a suitable residence.

Yours,          M. J. ANGIER."

Mr. Angier."

He also read in evidence the record of the proceedings in the matter of his bankruptcy.

His petition was filed 5th February 1868.  He was discharged on 27th March 1869.  Among the creditors returned are Robert Smith (deponent's father) for $10,750, William D. Smith (her brother), $21,588.

He called W. D. Smith, the brother of respondent, who testified that she had lived with his family in the summer of 1866.  She went to Newport and spent the summer there and returned to Philadelphia in November, had resided with him or his sister Mrs. Whitney since, and had not been living with her husband; witness had loaned to libellant and endorsed for him in 1865 and 1866; libellant owed him about $24,000.  The respondent had been in the habit of spending the summer at Newport for a number of years; both before and since her marriage.

H. C. Dallett testified that he rented the libellant's house 2031 Walnut street, on the 20th of August 1866, at a rent of $2000. Libellant removed all the furniture, except some mirrors, &c., belonging to Mrs. Angier, which remained subject to her order.

Rose Glacken, who had been a servant with the parties, testified that when the respondent came from Newport in the fall of 1866, she said she would not return; when she came back the house was broken up.

Mrs. Neilson, who kept a boarding-house, testified:—

" Over two years ago Mr. Angier took board with me; it was about the latter part of August 1866; he engaged two rooms for himself and wife, with the understanding that if she went to Europe, his father was to come in her stead.  He took the rooms on second floor at the corner, two large rooms, the handsomest I have.  I had at that time twenty-six or twenty-eight boarders, ladies and gentlemen.  Mrs. Angier did not come to my house while Mr. Angier was there; he paid full board for himself and her till the latter part of May or early in June.  He took the rooms in end of August, and commenced paying for them from 1st of September.  The board he paid was $65 per week."

Libellant gave evidence that he boarded in Spruce street with comfortable accommodations, and that the respondent had never visited him there.

The respondent then gave in evidence the following letters:—

"August 25th 1866.

Dear Sir:

Mr. Smith offers to take the house, No. 2031 Walnut street, at

[Angier *v.* Angier.]

an annual rent of $2000, for his daughter Mrs. Angier's occupancy, and to guaranty Mr. Angier against any liabilities whatever from any quarter that may be contracted by Mrs. Angier.

　　　　Yours truly,　　　　Constant Guillou,
　　　　　　　　　　　　　Attorney for Mrs. Angier.

Mr. Northrop,
　Attorney for Mr. Angier."

　　　　　　　　　　　"Philadelphia, August 25th 1866.
C. Guillou, Esq.

　Dear Sir: Your proposition of this date is declined. Mr. Angier renews his offers to take Mrs. Angier with him to two rooms at a boarding-house, and declines any arrangement by which any other person than himself shall control his family arrangements.

　　　　Yours truly,　　　　George Northrop,
　　　　　　　　　　Attorney for W. R. Angier."

　　　　　　　　　" Philadelphia, September 1st 1866.
C. Guillou, Esq.

　My Dear Sir: My client, Mr. W. R. Angier, has notified Mrs. Angier that he has rented his late residence on Walnut street above 20th and taken board for himself and her at Mrs. Neilson's, N. W. corner of Broad and Locust streets, where he has secured two rooms on the second floor.

　He has also notified her that he wishes her to remove her furniture, &c., from his late residence on Walnut street or give him such orders with reference to its disposition as may seem good to her.

　To both of these notifications Mrs. Angier has returned letters of reproach, but has omitted all instructions or suggestions. My object in addressing you is to ask you as her counsel whether you have had any suggestions or instructions from her in relation to these matters, and whether you are authorized to send any one on her behalf to take charge of her furniture, &c., and whether it is your wish that we should act for her in the matter.

　　　　Yours truly,　　　　George Northrop,
　　　　　　　　　　Attorney for W. R. Angier."

"Dear Sir:

　In reply to your favor, just received, I beg to say that my professional connection with the matter does not authorize me to take any action in regard to Mr. Angier's threatened removal of the furniture.

　　　　Truly yours,　　　　Constant Guillou.
George Northrop, Esq.　　　　September 1st 1866."

[Angier *v.* Angier.]

"Philadelphia, September 28th 1866.

Constant Guillou, Esq.
    Counsel for Mrs. W. R. Angier.
Dear Sir:
    I herewith send a list of the furniture, &c., belonging to Mrs. W. R. Angier, which has been stored as hereinafter stated, and all of which is subject to her order. Will you have the kindness, as her counsel, to transmit it to her."

Then follows a list of furniture, silver, jewelry, &c., stored at different places.

"WM. ROTCH ANGIER."

"No. 615 Walnut Street.

Dear Sir:
    Your favor dated 28th ult. was brought to my office an hour since. In compliance with your request I transmit it to Mrs. Angier, at Newport, by to-day's mail.

You will understand that she adheres to her protest against the course which you have pursued relative to 2031 Walnut street, the removal of a part of her chattels, and the leaving of the residue upon premises understood to be rented out.

        Yours respectfully,        CONSTANT GUILLOU.
    Mr. Wm. Rotch Angier.                October 1st 1866."

Robert Smith, the father of respondent, testified: The parties lived with him for 18 months or 2 years after their marriage; witness defrayed all the expenses for their support; he furnished the house in Walnut street; since their marriage he had contributed $28,000 or $30,000 to their expenses, including furniture. Witness asked libellant why he was removing the furniture, &c., he said to lessen his expenses, he thought they were about $10,000. Witness further testified: "I then asked him if the only reason he had for breaking up housekeeping was the expenses, if he and Mrs. Angier would remain in the house and avoid scandal I would bear all the expense, and it should not cost him a dollar; it was possible to reconcile them together. He declined the proposition, saying it was useless, they could not live happily together. He then remarked, why don't she give me a divorce? or grant me a divorce? I answered she should not do that, his conduct did not deserve it." * * *

"Mrs. Angier's visits to Newport were made annually, before and after her marriage; she was always at my house or her sister's, except one season, when he took a cottage there; the house in town was left in 1866, just as in previous years. She went either with one of the family, or one of the servants, I am not sure which."

The respondent offered to prove "a series and frequent repeti-

tion of humiliating and insulting language and opprobrious epithets addressed by libellant to respondent in the presence of her servants."

This offer was objected to, that no language or act could be given in evidence which would not furnish the wife sufficient ground to obtain a divorce: also, no notice or specification had been served on libellant stating the acts to be relied on as furnishing cause for desertion.

The court rejected the evidence, and sealed a bill of exceptions.

Judge Pierce in his charge said :     *     *     *

"[You will remember that the husband has the right to determine the place of residence for himself and his wife; it would, of course, be wiser and better to consult her upon the subject, but this is not indispensable. The law vests in him the right to determine and casts upon her the duty to accompany him, from which she can only be excused by such causes as would justify her in leaving his house, which, as already explained, are those causes which would justify her in applying for a divorce.] A wife is not justified in refusing to follow a husband to a home not so stately as the one she leaves; if the necessities of the husband require the change she must go, be the abode ever so different or humble.

"But it is contended here that the husband deserted the wife; that the home which they had occupied still remained, and that there was no necessity for his leaving it. His answer is that he did not elect to abide there or have her father support her, preferring to be at the head of his own house. I charge you that the husband was under no obligation to accept her father's proffered bounty and might lawfully prefer to take upon himself the support of his family.

"[As to the suggestion that his object in breaking up the establishment was to effect the separation and effect the desertion of his wife, this cannot be material so long as he made a home which he offered her.] Even if he desired the separation, so long as he provided a home and there was no consent on his part that she should stay from it, she was not justified in doing so by apprehensions that she might not be so happy as she was at the old home."

The verdict was for the libellant.

The decree was as follows :—

"An issue having been formed in this case between the said libellant William R. Angier and the said respondent Mary Jane Angier, to try the matters of fact affirmed on the one side and denied on the other, and the said issue having been tried by a jury, and a verdict rendered by them in favor of the libellant, the said William R. Angier, and the court having fully heard and considered the said cause proceeded to determine the same as to law

[Angier *v.* Angier.]

and justice appertains, and do now, this 10th day of July, A. D. 1869, sentence and decree that the said William R. Angier the libellant, be divorced and separated from the nuptial ties or bonds of matrimony contracted by him with the said Mary Jane Angier the respondent, according to the Act of Assembly in such cases made and provided."

The respondent appealed to the Supreme Court and assigned for error—rejecting her offer of evidence; the parts of the charge in brackets, and in decreeing a divorce.

*L. C. Cassidy* and *C. Guillou*, for appellant.—There was no necessity for notice to introduce the facts in the offer of evidence unless a specification had been called for. They were as much in answer to the libel as any other facts: Breinig *v.* Breinig, 2 Casey 161; Cattison *v.* Cattison, 10 Harris 276. The evidence rejected was important as showing the libellant's intention in breaking up his housekeeping: Gordon *v.* Gordon, 12 Wright 236; Hollister *v.* Hollister, 6 Barr 453; Richards *v.* Richards, 1 Wright 228; Carpenter *v.* Carpenter, Milward 159; Whispell *v.* Whispell, 4 Barb. 217; Dysart *v.* Dysart, 1 Robertson 106; D'Aguilar *v.* D'Aguilar, 1 Haggard 773, note; Reese *v.* Reese, 23 Alabama 785; Chesnutt *v.* Chesnutt, 28 Eng. Law & Eq. 603. The evidence was pertinent as showing what indignities the respondent might reasonably expect would be inflicted upon her, aggravated by the circumstance that they would be with more publicity: 1 Bishop on Marriage and Divorce, §§ 699, 725; Breinig *v.* Meitzler, 11 Harris 161. It was not necessary to render the wife's condition intolerable that there should have been blows, indignities would be sufficient: Elmes *v.* Elmes, 9 Barr 167; Butler *v.* Butler, 1 Parsons Eq. C. 329; Richards *v.* Richards, 1 Wright 226. The wife was not bound to follow her husband under all circumstances to a place to which he might capriciously choose to go: Tyson's Appeal, 10 Barr 223; Cronise *v.* Cronise, 4 P. F. Smith 265; Bishop *v.* Bishop, 6 Casey 413. For some purposes a wife may have a domicil different from her husband: Colvin *v.* Reed, 5 P. F. Smith 379; Starrett *v.* Wynn, 17 S. & R. 130. She did not wilfully desert, &c., he deserted and it was competent for her to show it: Bishop on Marriage and Divorce, §§ 673, 674, 681; Cattison *v.* Cattison, Bishop *v.* Bishop, *supra;* Ingersoll *v.* Ingersoll, 13 Wright 249. The court must see that the testimony is sufficient to justify a decree of divorce: Edmonds' Appeal, 7 P. F. Smith 232.

*G. Northrop*, for appellee.—The respondent's expressed willingness to *return*, admits a desertion. The court will not interfere with the finding of the jury: Andrews *v.* Andrews, 5 S. & R. 374. Her intent to desert was manifest when she withdrew from her

husband's residence: Ingersoll *v.* Ingersoll, *supra.* "Maliciously" is equivalent to "wilfully": Chapman *v.* Com'th, 5 Whart. 427; Bishop on Marriage and Divorce, § 397, note. The reasonable cause which will justify a wife in quitting her husband is that, only, which would entitle her to a divorce: Eshbach *v.* Eshbach, 11 Harris 345; Groves' Appeal, 1 Wright 447; Butler *v.* Butler, 1 Parsons 329; Gordon *v.* Gordon, 12 Wright 233. Notice of the facts to be proved should have been given: Steele *v.* Steele, 1 Dallas 409; Garrat *v.* Garrat, 4 Yeates 244; Light *v.* Light, 17 S. & R. 276; Hoffman *v.* Hoffman, 6 Casey 420.

The opinion of the court was delivered, January 24th 1870, by

THOMPSON, C. J.—One of the grounds for divorce from the bonds of matrimony contained in the Act of 13th of March 1815, is for wilful and malicious desertion, and absence of one party from the habitation of the other, without reasonable cause, for the space of, or during the period of two years. The applicant for a divorce on this ground must establish with sufficient certainty, each and every of these ingredients, as elements necessary to constitute desertion within the meaning of the act. They all must co-exist in proof, or no decree can be granted.

Collusive applications for divorces are strictly forbidden by the statute, and, in order to guard against them, any presumption that such is the case must be negatived in the outset by the oath of the party applying, setting forth that the application is "not made out of levity, or by collusion, and for the mere purpose of being freed and separated, * * * but in sincerity and truth for the causes mentioned in said petition." Whatever, therefore, may be the grounds upon which an application is made, the libellant must, by his or her oath, make it appear to the court that for that cause, and for that alone, a divorce is desired and claimed.

This is the applicant's primâ facie case, and it is made out when the petition is in form, and sworn to. But as in every other proceeding in law or equity, this primâ facie case may be overturned or disproved. If it should be shown in any case that the application is not, in fact, based upon the grounds stated, but that the causes set forth are merely to advance a scheme or trick to make out a technical case to sever the bonds of matrimony, no court would permit the application to be successful. It would be against law, justice and truth to do so. Courts ought never to sever the marriage contract, but where the application is made "in sincerity and truth," for the causes set forth, and no other, and fully sustained by testimony.

In this view of the law, we think the learned judge below pushed a principle, which might be all right in some cases, too far, when he said, in view of the evidence in this case, "that as to the suggestion that the libellant's object in breaking up the establishment

[Angier v. Angier.]

(his house) was to effect the separation, and effect the desertion of his wife,—this cannot be material so long as he provided a home, which he offered her. Even if he desired the separation, so long as he provided a home, and there was no consent on his part that she should stay from it, she was not justified in doing so, by apprehensions that she might not be so happy as she was at the old home."

This view overlooked the testimony in the case in one important aspect, and prevented the jury from inferring from it facts of which it was full, in another.

The alleged desertion of the respondent was attempted to be established by proof that after the libellant had broken up his home in the absence of his wife, without consultation, or any knowledge of an intention to do so communicated to her, she failed to go to quarters proffered to her at a boarding-house. He was, in point of fact, the first to desert. It must be remembered that he claims no desertion by proof against his wife, until after he had broken up their household establishment and left, and formally notified her to take possession of her share of the household goods. Was she bound to follow him if she had good reason to believe that his movements were solely with a view to force her to desert his habitation, and thus make a case for him? Was he not bound to exhibit a case of good faith on his part, in order to be entitled to charge bad faith on hers? If the evidence were full to the fact that he desired to get rid of his wife previously to his giving up housekeeping, and that all that he did afterwards was to consummate that design, was he entitled to be divorced? Would that be a divorce applied for "in sincerity and truth?" viz., for the desertion of his wife, if he had labored and schemed to provoke that desertion? This cannot be, unless the necessity of possessing a good cause is no merit in a divorce proceeding. But this charge of the learned judge deprived the libellant of the inferences from the testimony, that the whole thing was concocted in fraud of the divorce laws; and his notification of a room for her at a boarding-house, was but a part of a scheme to throw off the bonds into which he had voluntarily entered, and which, from caprice or other cause, had become annoying to him. She was entitled to such an inference from the testimony, if legitimate, and this was for the jury, but was forestalled by the above view of the law.

There was no desertion from the habitation of the libellant by the respondent, and in this respect the case is very different from the cases cited to show that if a wife deserts the habitation of her husband, or the husband turns a wife out of doors, that such acts can only be justified by reasons which would entitle the party to a divorce. Of this character are the cases of Eshbach v. Eshbach, 11 Harris 343; Groves's Appeal, 1 Wright 443, and Gordon v.

Gordon, 12 Id. 226.   Here the libellant left without any cause or reason, as disclosed to his wife.   The doctrine advanced was that she was bound to follow his footsteps, notwithstanding every act might persuade that he did not desire her association as a wife. If she failed to do so under such circumstances, after expressing herself entirely willing to do so, is wilful and malicious desertion to be inferred against her?   By first leaving his habitation, he gave his wife the opportunity of showing why he did it, and why and wherefore she did not follow; and if she could show by his acts and declarations that he in fact did not desire her to follow and live with him, would such a failure necessarily furnish a reason for an inference of wilful and malicious desertion from his bed and board?   In Bishop *v.* Bishop, 6 Casey 412, we held that wilful and malicious desertion was not to be inferred from a refusal on part of the wife to cross the ocean and join a husband who had broken up their household establishment and emigrated to America.   We thought her case entitled to be considered in the light of the difficulties put before her by her husband voluntarily and without any controlling necessity, and that proof in addition to the absence of the wife, was necessary in order to establish the desertion to be of the character required by the Act of Assembly. We gave her the advantage of the presumption of innocence until the contrary should be established.   Had she deserted her husband's habitation without reasonable cause before he left England, a different case would doubtless have been presented.   So indeed would it have been in the case in hand.   For it has been held in the cases referred to, *supra*, that unless turned out by her husband, or leaving him for causes which would entitle her to a divorce, the desertion meant by the Act of Assembly would be inferred—for the act gives this effect to such absence without there be reasonable cause; and reasonable cause has been settled to be, such cause as would entitle to a divorce.

Although the wife in this case might not be justified to the extent of entitling her to a divorce on account of the bad faith of her husband in breaking up his establishment with a design ultimately to force her to desert him, nor even to prevent him from obtaining one if she persisted in refusing to rejoin him if he desired her to do so in good faith; yet she might undoubtedly show that all that had been done in breaking up housekeeping by her husband, was with a view to put himself into a position to claim a divorce from her, as a good reason why she did not follow him to become the victim of his schemes.   In such a condition of things, neither party could claim a divorce; their case would not be within the Act of Assembly.   This sort of proof would be a mode of negativing the charge of wilful and malicious desertion. He could not claim a divorce based upon his own schemes to promote it.   To allow this would be to permit him to do what the

law forbids, namely, to take advantage of his own wrong. We think, therefore, the learned judge erred in the instructions referred to, and which we need not further discuss.

We are also of opinion that the learned judge erred in refusing the offer of respondent to prove a series of " humiliating language and opprobrious epithets addressed to her in the presence of her servants."

This testimony should have been admitted as pertinent to the question of the motives of the libellant in breaking up his household establishment, and to show that the object of the libellant in doing so was to force the respondent to refuse joining him in a boarding-house, or to compel her to abandon him in time, if she did. This was her theory of his actions and motives, and she was entitled to prove it if she could. If a jury would be bound to infer this from the testimony, it would present a case of fraud upon the law and upon the respondent, which ought and would prevent a divorce upon his application.

I cannot for my life see why fraud and chicanery are not to have the effect to defeat a party practising them, in an attempt to rescind the marriage contract, as well as in every other case; yet it seems sometimes to be regarded as an exception to the rule that fraud vitiates whatever it touches. Unless we regard a wife as possessing " no rights which the law is bound to respect," we are bound to protect her against the fraud of her husband when it may go to affect her dearest rights, as we would against his force and violence. If a scheme be disclosed to get rid of a wife, by exposing her to insult before strangers, until she shrinks from and abandons her persecutor, is he to be rewarded by a rescission of his marriage bonds, just as if he had acted honestly, and she wilfully and maliciously? Verily, no. She may defeat his unworthy attempts by showing that her refusal to follow him was to avoid his schemes to get rid of her, and not through wilfulness and malice, with just the same effect as if she had gone to him and suffered, and endured, until she could endure no longer. The testimony offered was a step in the line of proof to show a scheme to get rid of the respondent, and when received, it might or might not have proved it, just as the jury might determine. But it ought to have gone to them. If fraud be admissible to be set up against such an application, and we have said it is, then ought the testimony to have been admitted on that ground. Great latitude of proof is allowable in an issue of fraud, or where it may be alleged and is material to be proved.

Notice of the special matters to be given in evidence might have been required from the respondent beforehand, but it was not. And as there was no rule of court requiring it to be given, and no demand for it, we think the testimony was not properly rejected for the want of it, as the learned judge held.

[Angier *v.* Angier.]

This is about what we ruled in Breinig *v.* Breinig, 2 Casey 161. In Garrat *v.* Garrat, 4 Yeates 244, a nonsuit was granted for want of notice of special matter, but with leave to take it off, which was afterwards done.   It will be remembered that this was against the libellant, whose libel was defective in specification.   There was surprise in that case, in offering new matter different from that disclosed by the libel.   Nothing like that appears to have been claimed here.   We think the want of notice of special matters not required by rule of court, or by any special order, was not a ground for refusing the evidence offered.   It may be good practice to give notice or to call for it ; it saves controversy : but if neither be done it would be a peculiar case which would justify a rejection of testimony on the ground of want of notice, when that is for the first time suggested in the midst of a trial.   Such we think was not this case.   The reasons thus given as to these two complaints of error are sufficient to require us to reverse the decree of the court below.

Must we send the case back to be retried on the issue ?   We think not.   When we inspect the record there was, properly speaking, no issue in the case within the meaning of the Act of Assembly.   A jury seems to have been sworn to try the case between the libellant and respondent, on the libel and answer. But the Act of Assembly provides for a jury, only, when either party shall desire any matter of fact, which is affirmed by one party and denied by the other, to be so tried.   That does not appear by the facts as presented to have been the case.   The jury was brought in, seemingly, as assistants to the court, when they were really not necessary.   The decree was by the court, on bill, answer and proof, and is here on appeal, and subject to be disposed of as if no jury had sat in the case.   We will therefore dispose of the case as we conceive the merits under the evidence require.

We are of opinion, from a careful consideration of all the testimony, and drawing all legal inferences from it, that the libellant is not entitled to claim a divorce from his wife.   We think it shows that the application was not made "in sincerity and truth," for the causes set forth, viz., the desertion of the wife; but that that as a cause, so far as shown and claimed, was the result of the management, scheming and colorable conduct of the applicant.   We hold that where such conduct has reacted on the conduct of the wife, so as to keep her absent from her husband, who has left her and her abode, it necessarily meets the allegation of wilful desertion, and deprives him of the right to claim advantage of certain acts and conduct which he has promoted and designed.   Like in all other cases in equity, the applicant must be *rectus in curia ;* have a good cause, and the respondent a bad one. This must always be the case where the divorce is resisted.   The party who would,win in such a contest must be clear of everything

which is charged as a cause of separation against the opposite party.

We will refer to a few of the facts disclosed by the testimony, observing that no portion of it not noticed specially does in the least, in our opinion, raise a counter current to that produced by the facts to be noticed.

In the summer of 1866, the respondent being absent at Newport with the assent of the libellant, he suddenly commenced to break up his residence, and on being remonstrated with for doing so by the respondent's father, he made as an excuse, the statement that his establishment was too expensive for his circumstances. To obviate this, Mr. Smith offered to undertake to defray all the expenses of his daughter, the respondent, and eventually proposed to pay rent for the house in a sum equal, as it turns out, to that for which the libellant rented it to another party, viz., $2000 per year. Met as to the objection of expense, the libellant declared in substance that it was useless to insist on him to keep the establishment, "that they," meaning himself and wife, "could not live happily together," exclaiming, "why don't she give me a divorce, or grant me a divorce?" This, unexplained, cannot but be regarded as the key-note to all his after conduct.

He proceeded to break up the establishment, and on the 30th of August 1866, addressed to his wife, who had been absent, with his consent, as already seen, for some time, the following note:

"Mrs. Angier: I have taken rooms and board for you and myself at Mrs. Neilson's, N. W. corner of Broad and Locust streets. On Monday next they will be ready for occupancy. Please have the furniture belonging to you removed from 2031 Walnut street (former residence), or give me such directions as may be necessary about it. There are certain articles about the house belonging to me which I will remove. Yours, truly."

To any mind, and especially to a wife's, this would mean separation, if words mean anything. It was withdrawal on his part, and a setting off her goods and chattels to her, as if it were no longer intended that she was to live with him, and with a personal reclamation of his own from their joint possession, for his own enjoyment and use. Their home was thus broken up, when its occupancy might have been continued almost without expense, and his wife notified in the coldest manner, of rooms taken, and to be "ready for occupancy on Monday next." No one could make out of this a desire on his part for the society of his wife. She could read nothing but a wish for separation, interpreted in the light of his impatient exclamation of a desire for a divorce, and his refusal of indemnity against expense by his father-in-law, who was amply able to make it good. This offer she could hardly believe was refused from delicacy and a disinclination to avail himself of

[Angier *v.* Angier.]

gratuitous support from friends. She must have known that he had been the recipient of very large sums already from her father and brother, amounting in the aggregate, as his schedule in bankruptcy shows, to between thirty and forty thousand dollars. The respondent replied to this note within a day or two, and remonstrating against his breaking up their home without knowledge or assent by her; reminding him of past unkind treatment at home, and after all this, desiring to take her to a boarding-house, "where," as she says, "strangers might be witnesses to the treatment she had been so long subject to:" she concluded by saying, "I intend returning (from Newport) on Saturday, ready to return to you whenever you express a wish to that effect, and provide a suitable residence."

Neither to the charges of bad treatment or the offer to return did the libellant ever reply, either to assure her he wished her to come to, and live with him, or that he had procured a proper residence for her. She did not decline to join him, but wished some sign or token that it was desired, and that a fit place was provided. If he had desired her presence after having broken up her home without consulting her, it was his duty to have said so; but he did not, and in two days after her return to the city to the house of her brother, without a sign or a wish that she should follow him, he charges desertion upon her.

Without recapitulating the facts in proof further, it is apparent, we think, that the boarding-house project was a scheme to effect a separation. He rented his own house, in which they had lived, for $2000 per year, and took rooms at Mrs. Neilson's, at the rate of $2000 a year. There was no great economy in this, especially as he was offered to be indemnified against every expense of his wife, at his old residence. It is evident therefore he did not expect nor wish that his wife should come to the boarding-house and live with him. This seems plain from his whole conduct, but especially does it appear from the testimony of Mrs. Neilson, of whom he engaged rooms. She says "he engaged two rooms for himself and wife, with the uuderstanding that if she (his wife) went to Europe, his father was to come in her stead!" Where this idea originated of her going to Europe, we are not informed by the testimony, but are obliged to presume that the rooms were not taken with any intention of their ever becoming the home of his wife. This, and numerous other things in the testimony show such an apparent case of management and scheming on part of the libellant to provoke desertion on part of his wife, as acquits her of the charge of wilful and malicious desertion, and proves him guilty of practising such bad faith in exhibiting his bill for a divorce from the bonds of matrimony, as required the court below to dismiss his bill as unfit, under the testimony to be granted. Considering the case on its merits, as we have done, we do not

[Angier *v.* Angier.]

find that the libellant has made out any such case of wilful and malicious desertion of the wife as is required in law to be the foundation for a decree of divorce, but are constrained to conclude from the evidence, that whatever of desertion there was in the case was brought about by the acts of the libellant himself, and that he is not entitled to the decree he seeks.

Decree of the court below is reversed, and the libellant's bill is dismissed at his costs.