# Edmond's Appeal.

1. Divorces should not be decreed without clear and satisfactory evidence of the wrong which the law treats as justifying cause for a divorce. Especially when the witnesses are likely to be biassed and have not been subjected to cross-examination.

2. The court must be informed what the respondent has done, not what the witnesses may conclude, or what they may regard as the character of his conduct.

February 11th 1868. Before THOMPSON, C. J., STRONG, AGNEW and SHARSWOOD, JJ. READ, J., at Nisi Prius.

Appeal from the decree of the Court of Common Pleas of *Philadelphia:* No. 181, to January Term 1868.

In the court below this was a libel for divorce, filed December 18th 1858, in which Philadelphia S. J. Edmond was the libellant, and her husband, John Edmond, respondent. There was no service of notice of the proceedings on the respondent until after the decree.

The libel set out the marriage of the parties in April 1846; their living together as man and wife until November 1848; and that the respondent had "offered such indignities to the person of the petitioner as to render her condition intolerable, and her life burthensome, and thereby forced her to withdraw from his house and company."

An examiner was appointed, before whom the depositions of Margaret Jane Orton and Thomas Orton, the mother and father of the libellant, were taken.

Mrs. Orton testified:—

"Immediately after the marriage of libellant and respondent, they lived together at my house in London, England. Respondent's conduct towards libellant was such as to compel her to leave him. I have seen bruises upon the arm which were inflicted by the respondent. I have seen them upon more than

[Edmond's Appeal.]

one occasion, and upon different arms. I have never seen him strike her—but I know he did—but I have gone into their presence immediately after his exhibition of temper, and have seen from his countenance and excitement of no ordinary kind, that his conduct towards her was anything but that of kindness and affection. His deportment and conduct towards her had such an effect upon her health, that we were obliged to take her solely under the protection of myself and husband. In addition to his positive acts of unkindness, he was in the habit of absenting himself from the house night after night. Libellant's health was very much affected by respondent's continual ill-treatment; and to such an extent, that we were obliged to seek medical advice and relief on the Continent of Europe.

"Respondent's conduct towards libellant commenced a few weeks after their marriage, and continued up to the time when I was compelled to remove her. Respondent's temper being so excitable and violent, I have upon many occasions, when entering her chamber, found her in tears; and often upon entering the parlor found her in the same condition. The effects of this undermined her constitution, and it was this state of her health that rendered it necessary for us to travel over the Continent. Respondent, to my knowledge, has never been in this country."

Mr. Orton testified :—

"I have seen libellant unhappy, which showed itself decidedly in the loss of her health. Her health was so seriously affected from that cause that I resorted to medical advice. One symptom was the unhappy state of her mind. It showed itself in more ways than one, sometimes in tears and in other respects and ways. We were compelled to travel on the Continent on account of her health. Before starting for the Continent, respondent seized hold of libellant in the public street in my presence. He took hold of her by the arm in a violent way to drag her into a public cab. He was exceedingly excited, and more like a madman than anything else. I interfered, and it was only through the assistance of a policeman, that he was prevented from succeeding in the accomplishment of his purpose. Libellant resisted his efforts, and tried to escape from him. She was very much alarmed. After this we made up our minds to go to the Continent, with a view to restore her health. Upon another occasion before going to the Continent, the respondent came to my residence at midnight. Libellant was then living with me. He broke open the shutters and windows. A friend, then in the house, went and procured the services of a policeman, who arrested and took respondent away. Respondent was extremely violent and noisy. He said he wanted his wife, who was dreadfully alarmed under the apprehension that he might succeed in getting into the house. From the date of their marriage down to the present time, respondent

has never contributed or paid one dollar towards the support and maintenance of libellant."

A divorce *a vinculo matrimonii* was decreed October 22d 1859.

By Act of Assembly of May 14th 1867, Pamph. L. 1327, the time for taking an appeal from this decree was extended to January 1st 1868.

The respondent accordingly appealed, and assigned the decree for error.

*R. N. Wilson*, for appellant, cited Bishop *v.* Bishop, 6 Casey 412; 1 Bishop on Marriage and Divorce, § 769; Eshbach *v.* Eshbach, 11 Harris 343; Richards *v.* Richards, 1 Wright 225; Butler *v.* Butler, 1 Pars. 339; Elmes *v.* Elmes, 9 Barr 166; Caruthers *v.* Caruthers, 13 Iowa 266; Hooper *v.* Hooper, 19 Mo. 355; Cheatham *v.* Cheatham, 10 Id. 296; Evans *v.* Evans, 1 Hagg. 36.

There was no counsel for the appellee.

The opinion of the court was delivered, February 20th 1868, by

Strong, J.—In the court below this was a libel for a divorce *a vinculo matrimonii*, in which the divorce prayed for was decreed. The ground as set forth in the libel was, that the appellant had offered such indignities to the person of the appellee as to render her condition intolerable and her life burdensome, and thereby forced her to withdraw from his house and company. The trial was ex parte, the appellant not having been actually summoned, and having been at the time resident in a foreign country. The witnesses by whom the alleged indignities were attempted to be proved, were the father and mother of the wife, with whom she was residing; and the indignities themselves were none of them averred to have been offered in this country. It was, therefore, eminently a case in which the evidence should have been carefully scrutinized. Divorces ought never to be decreed without clear and satisfactory evidence of the wrong which the law treats as justifying cause for a divorce. And this is especially true when the witnesses called to prove the wrong are likely to be biassed by relationship, or by affection for the party seeking a divorce, and where they have not been subjected to cross-examination. Opinions of such witnesses are worth nothing as proofs of wrongs inflicted. The court must be informed what the respondent has done; not what witnesses may conclude, or what they may regard as the character of his conduct.

These observations are called for by the facts of the present case. A divorce has been decreed on account of indignities offered to the person of a wife, when there was no satisfactory evidence that there had been any such indignities; and certainly none that

[Edmond's Appeal.]

rendered her condition intolerable and life burdensome. Neither of the witnesses had ever seen a blow inflicted, or heard an unkind word. The substance of their testimony is, that the parties after their marriage continued to reside with the wife's parents, from April 1846 until November 1848. The mother saw bruises on the wife's arms, which she inferred were inflicted by the husband— though why she drew this inference does not appear. This witness also intimates, rather than asserts, that the temper of the husband was excitable and violent, and she infers from that that his conduct towards the wife was unkind. She adds, that his deportment and conduct towards the wife (without describing what it was) had such an effect upon her health, that the parents were obliged to take her solely under their protection. She adds to this what she calls a positive act of unkindness, that the husband was in the habit of absenting himself from the house night after night. From the testimony of both the mother and the father, it is quite plain that they separated the parties. There is no evidence that the wife felt her condition intolerable. Living with her father and mother, she was was by them withdrawn from her husband. Until after the separation, there is no positive evidence of any personal violence or indignity of any kind. The mother proves none; nor does the father. He only saw his daughter unhappy, and sometimes in tears. He saw that she was in ill-health; but he does not intimate that it was caused by unkindness of her husband. The only positive evidence given of a single personal indignity, relates to an occurrence that took place probably after the parents had withdrawn the appellee from the society of the appellant, and shortly before they were about to take her to the Continent. The husband then seized his wife by the arm in a public street, and endeavored to put her into a cab, or, as the father says, " to drag her into a public cab." On another occasion he came to the father's house at midnight, and endeavored to effect an entrance, saying he wanted his wife. All this may have been unwise, but it was only natural for a husband whose wife had been separated from him against his consent, and, so far as it appears, without her wish for a separation. To conclude from this that such personal indignities had been inflicted as to render the wife's condition intolerable and her life burdensome, would be making divorces easy. The testimony is entirely insufficient to justify any decree of divorce, and the decree must be reversed.

> The decree of the Court of Common Pleas granting a divorce is reversed, and the libel of the appellee is dismissed.