## McCommons, Jr., *v.* McCommons, Appellant.

*Divorce—Cruel and barbarous treatment—Evidence—Insufficiency.*

A libel in divorce on the ground of cruel and barbarous treatment should be dismissed, where the record disclosed numerous quarrels and disagreements, but established no conduct which constituted such cruel and barbarous treatment as would warrant a divorce.

Refusal to have sexual intercourse is not sufficient ground for divorce.

Argued March 9, 1925. Appeal, No. 54, Oct. T., 1925, by respondent, from decree of C. P. Delaware Co., June T., 1921, No. 624, in the case of George N. McCommons, Jr., v. Bessie M. McCommons. Before PORTER, HENDERSON, TREXLER, KELLER, LINN and GAWTHROP, JJ. Reversed.

Libel in divorce. Before JOHNSON, P. J.

The facts are stated in the opinion of the Superior Court.

The case was referred to William B. McClenachan, Jr., Esq., as master, who recommended that a divorce be granted.

On exceptions to the master's report the court dismissed the exceptions and granted a divorce. Respondent appealed.

*Error assigned* was the decree of the court.

*J. DeHaven Ledward,* for appellant.

*William C. Alexander,* for appellee.

OPINION BY TREXLER, J., April 28, 1925:

This is an action of divorce. Libellant charges that his wife by cruel and barbarous treatment offered such indignities to his person as to render his condition intolerable and his life burdensome. The parties were married in 1911 and resided at the home of the husband's parents. They have a daughter, who at the time of the hearing was eight years old. At the time of the first hearing they were still living in the same house. The husband testifies as follows: about three years after their marriage unpleasant relations began, the wife was expecting a child and was angry because she was in that condition; they have had no sexual intercourse since that time. When he was appointed treasurer and tax collector of the township she tried to make him make mistakes and tore the shirts off his back when he was doing his work. With the money he would obtain from the office he would have built a home, but she was afraid that she would have to go to housekeeping. He started in the garage business, which she destroyed by making unkind remarks to the people who came there for information. She would not attend the door, insulted

people, and he had to give it up. She wanted to keep him down and out. He states that her complaint was, "you have never made a home for me" and further on in his narrative; "she said she didn't want a home, that I had never made a home for her, that she had me, that was her idea of it. I wanted to buy, or tried to buy, the house across the street from us. She told me if I did that I would live there by myself." Then he wanted to get a place in Sun Village. She would not agree to that. He tried to get properties at other places and to build a house but she persistently refused to agree to anything. Her conduct was very rash. A number of times she threatened his life and matters were so bad, he fastened his door at night. They did not occupy the same bedroom. She threatened to shoot him, threatened to poison him. He thought she would kill him if she could catch him asleep. When he came home from work he gave her the envelope and all the pay. The money she put in bank in both of their names. She treated the child very meanly. She would hit and slap the girl and would not let her go anywhere with her father. She did not want a man who worked in an iron foundry and came home dirty like a negro; what she wanted was an office man. She tried to influence the child against him and taught the child to swear at him. When he tried to correct the child she would interfere and tell the child to tell him to go to hell. She would not do any of the housework and compelled libellant's mother to wash the dishes and do the work. She would not sleep in the same bed with him because she was afraid she would get some disease. She would interfere with his books when he was treasurer and would throw them on the floor and he was forced to resign the position on that account. This is the tenor of his whole testimony; she was continually interfering with his success in life, always quarrelling and nagging. The attempt of his wife was to make "a bum out of him." She told a cousin of his that he was no good, that he ran around and these

remarks about him were also made when visitors came, both relatives and strangers. She was continually abusing him. His mother was called and she testified that she was a witness to the tearing off of the shirt but her observations as to other matters testified to by him were general and did not go into particulars. Her testimony was of little value as corroboration of his narrative.

The respondent's testimony strikes us by its frankness and sincere endeavor to speak the truth. She does not deny everything but admits some matters which are against her. At the second hearing which occurred on December 14, 1922, the first having been held October 23, 1922, she testified that they had been living in their common habitation up to three weeks before the second hearing. She has always been nervous even before the birth of the child and that increased her nervousness and she has never been in normal health since. Their married life was unhappy, although at first it had been all right for about four or five years. The cause of the unhappiness was his running around. She wanted a home of her own and many times asked her husband to establish one. Neither wanted children. She did not care for a child as long as it had to be brought forth in the home in which her husband's relatives lived. After the child came there was continual interference in the household. The husband came home about a week before the child was born but did not wait for the birth. He was a baseball player at that time and he left to play at some middle west city. She was not in want. She lived with his people and food was provided for her and she admits she has no complaint in this direction. Her reason for not wanting children was, that as stated before, she first wanted a home of her own and that is the only reason why she assumed that attitude. It was not over two years that relations ceased between them although some time before that the occasions were infrequent. He was out all hours of the night. He would come home in the early morning and when she asked

him where he had been and demanded explanations as. to the lateness of his home coming he would refuse to. give her any information or stated that he had been in lodge.   She does not deny that their quarrels became so acute that she hit him but that was because he hit her; he knocked her down several times, and that in the presence of his mother.   Once he knocked her up against the railing in the hall with such force that the newel came off and her hands and knuckles were bleeding. Her husband frequently promised to make a home but never did anything to carry out that promise.   Since she left their common habitation she is with her mother and the little girl goes to see her father every day.   She insists upon that as she wants him to have the affection of the child.   She used to do the ironing, did the cooking, made the beds and general housework.   She never interfered with his work as township treasurer and tax collector.   She did tear his shirt off but that was in the heat of argument and at the time when he had hit her and these arguments generally arose when she tried to have him go to housekeeping.   He would knock her down five or six times.   She testifies there was absolutely no interference with his garage business, but he lost his business because he did not attend to it.   She denies with particularity all the testimony that he gave in regard to his trying to secure a house.   She was always ready to go to a home which he would buy or build.   She never threatened his life except they were in the heat of argument when she said, in anger, she could kill him and that was after he had made nasty remarks to her.   They had continual fusses.   She does not know whether he fastened his door at night or not because she never tried to get into his room.   It is true that he gave her the money which she deposited in a joint account but she never drew out for herself.   She drew out one hundred dollars óne time but that was for him.   She never used a nickel for herself.   The money she saved he would. spend for motorcycles and things like that.   Some times

she got so mad at her husband that she swore at him and this the child may have heard and repeated. She admits that he was not a man given to profane language. She admits that she told him she would not go to bed with him for fear of contracting a disease, said that she did not think she should, as he came in at all hours of the night and she did not know what he had been doing. She never threw anything at him, never interfered with his record books, never touched any of them, and his resignation as treasurer was not due to any cause of that kind. In further reference to the garage business she states that he would get work but would not stay to finish it and the men would come get their machines and go somewhere else and have them repaired. She is willing to live with him now if he provides a home, separate and apart from his relatives.

The libellant has not made out his case by evidence sufficient to carry conviction. There is no question about it but that this is a case of incompatibility of temper. The refusal to have sexual intercourse is not sufficient ground for divorce: Platt v. Platt, 38 Pa. Superior Ct. 551, and cases there cited. We think after considering all the testimony in the case, the course of conduct which existed, was not such as would endanger his life nor were the indignities such as to render his condition intolerable and his life burdensome. Both parties were equally at fault. Personal violence was used by both and she was the greater sufferer. Her testimony as to some of the most serious charges which she brings against him is uncontradicted. The frequent public insults that were, as he says, hurled against him by her in the presence of many visitors, not relatives, would have been susceptible of proof, but none of these people were called. The parties lived in the same house up to within three weeks of the second hearing. We are not aided by any opinion filed by the lower court except a brief comment by the judge that "the master heard and saw the witnesses..... is better able to judge of the weight to give them than

the court." Needless to say that while that fact may have some bearing on the case it does not control it and after carefully reading the testimony, as we are required to do, we have come to a conclusion at variance with that of the master and the lower court.

The decree is reversed and the record is remitted to the court below with direction that the libel be dismissed. The appellee to pay the costs.