## Greims, Appellant, *v.* Greims.

*Divorce—Cruel and barbarous treatment—Indignities to the person—Burden of proof.*

In an action for divorce on the grounds of cruel and barbarous treatment, the libellant has the burden of proving her case with clear and satisfactory evidence, and where her testimony of the acts complained of is denied by the respondent and is without corroboration, although other persons were present when the acts were said to have been committed, the libel will be dismissed.

Argued October 16, 1925. Appeal No. 21, October T., 1925, by plaintiff, from decree of C. P. No. 1, Philadelphia County, March T., 1923, No. 272, in the case of Isabel Noble Greims v. Merton Ward Greims. Before PORTER, HENDERSON, TREXLER, KELLER, LINN and GAWTHROP, JJ. Affirmed.

Libel in divorce. Before McDEVITT, J.

The facts are stated in the opinion of the Superior Court.

The case was referred to Harry A. Mackey, Esq., as Master, who recommended that a divorce be granted. Subsequently, on exceptions to the Master's report, the court sustained the exceptions and dismissed the libel. Libellant appealed.

*Error assigned* was the decree of the court.

*William A. Gray,* for appellant.

*Francis Shunk Brown,* for appellee.

OPINION BY TREXLER, J., February 26, 1926:

As the master recommended the divorce and the lower court refused it, we will at some length state the substance of the testimony. The parties were married in August, 1915. They have lived continuously in Philadelphia, except one winter in Atlantic City and one

winter on the farm in Media. They have two children; one child seven years old, and the other child four years old. The husband is in the real estate business. Her statement is that the first difficulty occurred four or five months after they were married when the husband came home, took his wife by the throat, and she was very much insulted at that, took a plate and threw it at him. Later on he gave her a black eye. This occurred during a dispute as to whether they should have children or not. She states that at that time he desired her to have an abortion. Then her narrative continues with the assertion that he struck her from time to time, until she tells with some detail the occurrence that happened January 13th, 1922, when a friend, who had been coming to see her husband for some months, arrived very drunk at four o'clock in the morning. She asked her husband to let the man in, as she was a friend of his wife's and felt sorry for him. "I made him some coffee and Mr. Greims was furious because I showed this humane attention; he was mad at me for it." "The next morning I told my husband to get the man home to his wife." The husband then said this was the chance to get the sheriff, "for your being alone with him in the house." Then he struck her in the mouth with his fist, and as soon as he left, she took her suitcase and started divorce proceedings. After six weeks she went back to him again on February 12th, 1922. She narrates that thereafter while sitting in a trolley car on a back seat in Atlantic City at 12 o'clock at night, in an instant her husband threw his arm out and struck her. On frequent occasions he used vile language to his wife, abused her sister and father and embarrassed and humiliated her in public. He said she came from a good for nothing family. In the winter of 1922 they were going to town together and had an argument—he said he couldn't bear to look at her. She "got out" of the car in the middle of the road and there was no car for half an hour and the hus-

band threw some money after her and said she did not have the carfare. Her husband did not drink habitually—he drank occasionally. She visited an apartment, which he maintained with his brother, and says she found some suspicious looking underclothing and a large bottle of medicine used for venereal disease. She alleges some things in regard to their intimate relations, which will do no good to repeat here. On one occasion he tore the telephone from the connections. She was a singer and her husband thought her duty was toward the children and that she should not make engagements to sing in public. At one time the husband took lighted matches and threw them at the appellant and burnt holes in her clothes. The night before she finally left her husband, he brought a man named Roland to the house on which occasion her husband called her dirty names and abused her family. The same night her husband and a Mr. Smith came to the house and her husband was greatly intoxicated and put seven logs on the fire and poured kerosene on them. Mr. Roland was called as a witness and did not corroborate her in any detail. The climax came in the middle of the night when the little boy became very sick at his stomach and went down to the bath room, where her husband, she alleges, came across the room and slapped her in the face. She then called up her father and mother and her father called the police. In the meantime, Mr. Greims had gone upstairs, while the appellant's father and mother had come from their home, and were on the other side of the street. Greims and her father had entered into an altercation and Greims kicked the father in the stomach, and used abusive language. The next morning she took her suitcase and he took his. She went to the bank and he followed her. She drew out $20.00 and gave him half of it. Her story, if it were corroborated in essential particulars, would entitle her to

a divorce, but the trouble is that although the abuse which she complains of was frequent, and often in the presence of other people, there is not one witness, who testifies to the things which she narrates, except a girl named Snyder who was with them for a year and three months, and she does not go to the extremes that the wife does in narrating what occurred. She testifies that the husband swore at his wife, but that he did not call her any names that she could remember; that the only time that she saw him strike Mrs. Greims, was on January 13th, 1922, the first parting, when the drunken man came there at four o'clock in the morning, and Mrs. Greims suggested that they take him in. At that time she says she saw Mr. Greims start through the back way to get to his car and Mrs. Greims came right behind him; they were talking and he was telling her what he was going to do. She said something that made him mad and just as he got out of the kitchen door he struck her with his hands, on the side of the jaw. Mrs. Greims insisted on going with him. Her story is not very clear, as in the first instance she said Greims struck her with his hands in the face, but on further questioning she said, "it looked like a fist," and finally said she would call it a punch. As to the ordinary routine of the home, she testified that when they were not quarreling, they were very kind and agreeable to everybody, that Mr. Greims always talked back, (sic) but that Mrs. Greims did not start it.

If we take his side of the story, we are met with his denial in toto. Those occurrences which she testified occurred between her and her husband in the absence of witnesses, and which he categorically denied, we do not regard as proven, for there is nothing in the case to impeach his veracity. It is oath against oath. Her visits to the doctor to obtain an abortion can hardly be considered as cruel, for it appears that

she went there voluntarily. They were both parties to the crime. The episode of his striking her when they were in the trolley car amounts to nothing, as there are no details as to how he struck her, or any assertion of a preceding quarrel, or any reason given why he struck her. It may have been entirely unintentional. No member of the public, or her family were called to testify, or to substantiate her alleged humiliation by the appellee, although she testifies that this occurred frequently in the presence of others. From the time the parties resumed relations in February, 1922, until they finally separated, there are two episodes which the appellant testified to; one is the occurrence in the automobile, and the other, the time he threw lighted matches at her. We can see no cruelty in the fact that when they had had a quarrel, and the husband said he could not bear to look at her, she got out of the car, on her own volition, and he furnished her with trolley fare. The arrangement seemed to have been agreeable to both. He says she asked to get out of the car because it was an open car and the weather was cold, and he gave her some money to take the trolley car. As to the episode of the throwing of the burning matches, the appellant recalls the appellee throwing them, but did not know why he threw them, or what the surrounding circumstances were. This occurred only a year before the appellant was testifying before the master, and seems to have made very little impression on her. One of the most important matters in which she fails is in the account of when the drunken man was brought to the house. We have the testimony of the maid, Cecelia Carter, who states that when she came in their home that evening everything was harmonious. She corroborates in some respects the respondent's version of the affair. During the night, she heard the boy crying, and cleaned up the vomit in the husband's room,

not in the bathroom, that the appellant woke her up, asking her to be a witness that appellee hit her, and she heard nothing of the disturbance, and that both of them told her after the occurrence that when they went to housekeeping again they wanted her to live with them, and that the appellee did not use vile and profane language to his wife. Three other maids, who lived with the family a year, three months, and four months, respectively, corroborated appellee's testimony that he did not strike appellant nor threaten her; that he did not use profane or vulgar language, and that he stayed at home with appellant in the evenings. The tearing of the telephone out "by the roots" if it were proved, would show a bad temper, but would not be an evidence of cruelty. We do not think the appellant has made out a case for the granting of a divorce. The impression given after reading her testimony is that the occurrences are distorted and over-emphasized, and that much is made out of unimportant details. She has the burden of proving her case, and the denial of the respondent and the testimony of a number of witnesses, who were members of the household, renders her narrative improbable. The lower court was right in reversing the master and refusing the divorce. A decree like this should never be entered without clear and satisfactory evidence. Boller v. Boller, 81 Pa. Superior Ct., 334. There is no course of conduct shown here on the part of the husband that would render her condition intolerable or her life burdensome. The remarks made in Heckman v. Heckman, 81 Pa. Superior Ct., 370, apply: "All of the libellant's charges the respondent denied specifically in his testimony, and he called on his behalf witnesses who, by reason of their intimate and continued association with the libellant and respondent, should have known of the alleged acts of cruelty and indignities. They all, however, testified that they had

no such knowledge.'' It is our duty to pass upon the matter as presented to us and use our own judgment, and a careful consideration of the testimony leads us to conclude that the decree of the lower court should be affirmed.

The assignments of error are overruled and the decree of the lower court dismissing the libel is affirmed, the appellant to pay the costs.