## Dunlap v. Dunlap, Appellant.

Argued October 28, 1929.

Before PORTER, P. J., TREXLER, KELLER, LINN, GAW-THROP, CUNNINGHAM and BALDRIGE, JJ.

*N. F. Womer,* and with him *John C. Arnold,* for appellant.

*John J. Pentz,* and with him *W. C. Pentz* and *Ross H. Pentz,* for appellee.

OPINION BY LINN, J., December 12, 1929:

After a married life of thirty-four years on libellant's farm in Sandy Township, Clearfield County, libellant filed a libel in divorce in 1927 alleging indignities to the person within the statute as amended June 28, 1923, P. L. 886. The parties have four living, married children.

The evidence was taken by a master who retired on account of illness. The master who succeeded him considered the evidence taken and on that evidence filed a report and recommended a decree on the ground that respondent's conduct "is under the law what has been legally determined to be cruel and barbarous."

Exceptions were filed, considered by the court and were dismissed; a decree of divorce was then entered and is challenged by this appeal.

The learned court below in an opinion filed, stated, no doubt inadvertently, that "the master had before him the witnesses, observed their manner, their conduct, and the court should give great weight to the findings of the master as to credibility and weight to be given to the witnesses' testimony." As that was a mistake and as neither the master who recommended the decree, nor the court below saw the witnesses while testifying, the judges of this court are at no comparative disadvantage in weighing the testimony.

The decree cannot be sustained. It has always been the law in this state that a divorce may be granted only when the evidence brings a case clearly within the statute: Twaddell v. Twaddell, 95 Pa. Superior Ct. 429, 432, and cases there cited. That measure of proof is lacking in this record; the overwhelming weight of the evidence considered in the light of the corroboration appearing, is with the respondent; moreover, we think the libel was not filed with that good faith required by the statute (1815, 6 Sm. L. 286, 287) in force when this libel was filed, requiring that the complaint be "not made out of levity: or by collusion between the said husband and wife ......"

The parties had for many years led a somewhat quarrelsome existence, apparently about whether libellant was receiving his half share of what is described in the record as the "milk and egg money" collected by respondent on a "milk route" operated by her. In May, 1926, libellant became ill so that he could do no farm work, and for about two weeks was confined to his bed. He left his home in April, 1927, and thereafter lived with a son. The farm was small—only 50 acres—and respondent did as much or more work than libellant did on the farm, certainly for considerable

time prior to the date when he left. Her testimony contains the following: "What was your usual day, how was your time taken up?

"A. Well, I got up at that time, [four or five o'clock in May] made fire, fed three horses, milked eight cows, left the milk cool while I got breakfast, bottled the milk, then I would go to town and deliver the milk. When I got home, which was around noon or after dinner, I washed the milk bottles, washed the dishes, got supper and maybe sometimes while the milk was cooling I would sit down and pick up a paper. I had to harness the horse to go and deliver the milk. When that was all done, it was time to go to bed and get up in the morning and start all over again." In part she is corroborated by one of their sons and by a daughter who said her mother worked on the farm as a man would work; libellant, in referring to her milk-route, said that when "she drove the car she would get home along about ten o'clock and when she took the horse it would be the middle of the afternoon lots of times."

Libellant testified that when he was ill in May, 1926, his doctor prescribed beef broth and that his wife would not give it to him. There is evidence that their son and daughter-in-law lived with them at the time and that the daughter-in-law did the family cooking and household work, and did what was necessary for him, and that in addition, a Mrs. Bothel was in the house for four or five days during the two week period he spent in bed, and supplied him with what he then needed. During that period of course much of respondent's time was given to her milk-route and necessary preparation therefor. The witnesses agree that libellant and respondent cursed each other, (both admit their cursing) and we gather from the evidence that generally the libellant's language provoked the reply received. Libellant emphasizes another grievance: in

1926 "she grabbed a knife and said she would" stab him. Respondent testifies that the incident occurred in 1925 and she described it as follows:

"Q. What happened at that time?

"A. My horse was crippled and he told me I was late getting home. I told him my horse was crippled and he said I just loafed along the way and I said he was a liar and he called me a damn liar. Then he grabbed a milk can and was going to throw it at me. Then he backed me up against the door and grabbed both my wrists. I stood it just as long as I could and I got one hand away and grabbed a little paring knife.

"Q. Did you after that fight show any marks to anybody?

"A. The next morning I showed Harry Long black and blue marks on my arm."

The witness, Harry Long, referred to in her answer, testified that he lived on the adjoining farm, had known libellant since they were children, and that in 1925 respondent showed him a mark on her arm and that he said to her "I was a friend of hers and Charlie's and didn't want to hear this stuff." Libellant testified that she told other persons that she wished he would die and that she would kill him; it does not appear when he was informed of those statements, if they were made. Their daughter and her husband, who stated that they were not on friendly terms with the respondent (respondent had the daughter arrested for assault and battery) testified that respondent stated to them that she wished libellant would die. Respondent denied making the statements.

Respondent not only marketed milk, but also produce raised on the farm. They seem to have had an understanding that the money realized by the sale of the milk and produce belonged to both of them in equal shares, and he contended that after she paid for seeds, taxes, insurance, and other farm expenses she did not

always give him one-half of the money remaining or as much as he thought he was entitled to. In answer to the direct question whether the cause of their quarrels, particularly her alleged assault upon him with a knife, was about money, libellant replied that it was. At another place in the testimony when he was asked for the cause of their differences, he said "I wanted my money."

In libellant's brief it is said that the "housework" was entirely done by persons other than respondent and that libellant was compelled to "employ outside help" during his illness; according to the evidence in the record, showing the extent to which for a number of years and during the illness, respondent was engaged in operating the farm and daily attending to her milk-route during the hours specified, she cannot be charged with neglecting him in the circumstances, nor can he be said to have been neglected in any event, since his wants were supplied by "the outside help," by which, we assume, appellee's counsel meant Mrs. Bothel and his own daughter-in-law who lived with them and did the housework as has been stated.

There are other incidents also more or less trivial, referred to in the evidence which may be omitted here. Of course, if respondent had made an unprovoked assault on libellant with a knife as described by him, and if in fact she had refused to supply him with food when he was sick in bed and had not permitted others to supply him, and if the swearing and calling of opprobrious names had been by her alone unprovoked by him, there might be some basis for contending that she offered such indignities to his person as to render his condition intolerable and his life burdensome within the meaning of the Act of June 28, 1923, P. L. 886. But when we consider the weight of the evidence, much of it trivial, it cannot be said that indignities within the statute have been shown by credible evi-

dence or that libellant was "the innocent and injured person" contemplated by the statute providing for a decree for the relief of such person; compare Heckman v. Heckman, 81 Pa. Superior Ct. 370; McCommons v. McCommons, 85 Pa. Superior Ct. 323, 328; Lomax v. Lomax, 87 Pa. Superior Ct. 543, 544; Rommel v. Rommel, 78 Pa. Superior Ct. 511, 513, etc; Headland v. Headland, 88 Pa. Superior Ct. 417, 418.

So far we have reviewed the record on the theory on which it was considered below and presented here by counsel for the parties, but there is another element in the case which we are required to notice. The evidence justifies the conclusion that libellant directly, or through his son, made an effort to have respondent agree not to defend the divorce suit he proposed to bring. In consideration of her agreement not to defend, respondent conveyed to her one-half of the farm, though the deed is not transcribed in the record nor does it appear when it was delivered. The son testified: "Q. Just what were the circumstances under which the deed was given?

"A. It was that she was to give him a divorce. We talked it over, I talked to him and then went and talked to her. She was not there. It was done through me, that was my job.

"Q. It was your job to see that she did not fight any divorce that your father might start?

"A. That was supposed to be the agreement.

"Q. And then she got half of the farm and you got half?

"A. Yes."

In cross-examination of this son the following appears:

"Q. Now at the time of the transfer of half of the farm to you and half to your mother were you and Mr. Player working together in the agreement between your father and mother, or were you by yourself?

"A. I can't say that Mr. Player had much to do. We all talked the matter over from time to time.

"Q. You say that the proposition for the half of the farm for the divorce came from your father?

"A. My father was to have a divorce if he would give my mother half of the place.

"Q. Who made the proposition? Your father?

"A. That is the only condition that he would do anything with it.

"Q. Did he make the proposition to have you submit to your mother?

"A. Yes.

"Q. You did not suggest it to him, did you?

"A. No.

"Q. Your mother agreed on that basis?

"A. Yes."

On this subject respondent testified: "Q. Just what were the circumstances surrounding the transfer of the farm?

"A. Mr. Dunlap told me that if I would not fight a divorce he would do it. I told him I would see him in hell first.

"Q. He had been after you for some time to get a divorce?

"A. Yes.

"Q. How long have you been talking divorce?

"A. I could not tell you just how long. He offered me $1,000 to get off the place. He sent Fred to talk to me and I told them no. He said then that he would disgrace the whole family. I was sick at the time after the beating up Mrs. Spafford [her daughter, previously referred to in this opinion as arrested for assault and battery] gave me. He kept on and kept on and said he would leave the country if I didn't give in. I came down then to Pentz's office to sign the deed and it was made out in Fred's name. I told them I would not get a divorce if they didn't put my

name in. The next morning I went to their office again and W. C. Pentz told me there was the deed in Fred's name. I said, 'No, sir, nothing doing,' and I wouldn't sign the deed. He then said 'All right, get out of here, you old hag.' I said 'All right, I'll get out.' Then when we did sign the deed, Ross Pentz did that for us.''

In rebuttal libellant said on this subject: ''Q. These arrangements about the divorce, did you authorize them to make such a settlement?

''A. Well, I told them that if they could fix up something satisfactory, it would be all right with me.''

We understand from the evidence that libellant conveyed to respondent one-half of the farm for her agreement not to contest the divorce suit that he proposed to bring. His conduct is condemned by the well recognized public policy of the state (Shannon's Est., 289 Pa. 280, 283), which in the circumstances, disqualified him from bringing this divorce suit. The mere fact that his wife, instead of keeping her alleged agreement, defended the action—we assume the action was defended by her in good faith—does not relieve the proceeding of the illegality present from the beginning.

The decree of divorce is reversed and the record is remitted with instructions to dismiss the libel, costs to be paid by the libellant.