## Wagner *v.* Wagner, Appellant.

Argued October 26, 1933.

Before TREXLER, P. J., KELLER, CUNNINGHAM, BALDRIGE, STADTFELD, PARKER and JAMES, JJ.

*Grover C. Ladner,* of *Ladner & Ladner,* and with him *Alexander Love, Jr.,* for appellant.

*Wm. Y. C. Anderson,* for appellee.

OPINION BY STADTFELD, J., March 16, 1934:

This is an action in divorce a. v. m. by the husband, George A. Wagner, against his wife, Katherine E. Wagner, on the ground of cruel and barbarous treatment and indignities to the person. The libel was filed on May 5, 1930. The parties were married on April 1, 1916 and lived together at various places in the City of Philadelphia, until May 3, 1930, on which date libellant left the common residence of both parties. At the time of marriage, libellant was approximately 22 years old and his wife 20. Both parties had always been residents of Philadelphia. One child was born as a result of said marriage, George A. Wagner, Jr., 12 years of age, at the time of the hearing and residing with his mother, the respondent. The libellant is 37 years of age and employed as a draftsman by the Pennsylvania Railroad.

An answer was filed by respondent denying the allegations in the libel and averring that the libellant did wilfully, maliciously and without reasonable cause desert the respondent and leave her home and habitation from on or about May 3, 1930 to the date of filing the answer. The bill of particulars filed by libellant avers that the difficulties between the parties arose shortly after their marriage while living at the home of respondent's "drunken and pugnacious father," and continued at the other places where the parties subsequently resided. The alleged acts of cruel and barbarous treatment consisted of hitting libellant with a frying pan in the presence of a neighbor, the breaking of libellant's straw hats, the pointing of a loaded pistol at libellant on several occasions and threatening

to shoot him, the hurling of a filled jar of coffee at the libellant, the pummelling of libellant with her fists in the presence of spectators on several occasions, including occasions when libellant was dancing with women friends of respondent.

The indignities complained of were respondent's insistence that libellant give up smoking and playing music, her angrily breaking libellant's dishes and cups on the floor, the maintenance of her father, who was a drunkard, in libellant's home at the latter's expense, the incitement of respondent's brother to attack libellant, the extravagant and embarrassing use by respondent and her relatives of libellant's charge accounts at eight department stores, and the complete preference by respondent of her relatives to the relatives of libellant, to the extent of having her brother, sister and father live in the home which libellant established for her; that respondent excluded from libellant's home the latter's friends and relatives; that since the birth of their only child, respondent has refused to entertain the thought of having any more children, and has carried this refusal to the extent of denying libellant complete and satisfactory sexual intercourse; that against libellant's protest, respondent resorted to surgical interference with her genital parts in order to exclude and remove the possibility of conception; that respondent refused to live with him in other cities where his employment necessitated him to live; that respondent objected to his interest and participation in church work and in Freemasonry and insisted that he stay at home, and because of her objections he abandoned the same; that subsequently when he resumed these activities, he was threatened with explusion from the Masonic fraternity, at the respondent's instance; that libellant took up bowling to promote his health of mind and body, but respondent falsely accused him of making bowling an excuse

for flirtations and adulteries with various women; that on one occasion when libellant was bowling with his only child and two acquaintances, respondent appeared on the scene, struck libellant, tore up the score sheets and started to fight with one of the acquaintances before a large crowd; that respondent frequently threatened to cause him to be ousted from his employment by telephoning to libellant's superiors and telling them about his domestic troubles; that she constantly opened mail which came for libellant at the home of the parties and kept some of it from him; that she rifled his pockets and his pocket book; that she frequently locked the front door against libellant; that she adopted a course of shadowing libellant in the evenings to find out with whom he passed his time; that respondent and her brother who, he says, was enlisted in her aid, without cause accused him of adulterous practices; that in the last few months prior to May 3, 1930, respondent began absenting herself from home in the evenings, especially when libellant was remaining there; that finally on the evening of May 3, 1930, respondent went out from the house after telling libellant not to go to a certain place that night, and very shortly thereafter libellant answered a telephone call in which a man inquired whether "Miss" Katherine Wagner, meaning respondent, was at home; and that "this climax" of respondent's posing as a single woman, led libellant that same night, before the return of respondent, to withdraw from their common home which was owned by them in entireties, though purchased with libellant's money; that the conduct of respondent impaired libellant's health and put him in fear of his life.

Neither party took a rule for jury trial and the case was referred to Lewis W. Colfelt, Esquire, as master on March 13, 1931. Numerous meetings were held at which testimony was taken covering 635 typewritten

pages. Great latitude was permitted by the master, and a large part of the testimony bears no relevancy to the charges in the libel or bill of particulars. The master's report was filed on February 15, 1932 in which he found that the grounds for divorce set forth in the libel had been fully supported by the testimony and recommended that the prayer of the libel be granted. Exceptions to the master's report were filed on February 24, 1932. On July 21, 1932, the report was referred back to the master for further testimony. Additional testimony, covering over 400 pages of typewriting, was taken and a supplemental report of the master filed on December 22, 1932. In this supplemental report the master finds that the allegations contained in the libel have been fully substantiated by the testimony and again recommends that the prayer of the libel be granted. The testimony taken upon the re-reference related to the shadowing of libellant by her brother and herself and some of her friends, commencing the early part of March, 1932, and culminating in the arrest of libellant on May 6, 1932, on a charge of adultery on an information preferred by George Lehr, a brother of respondent, before a justice of the peace at Ambler. This information was made after consultation with an attorney in Montgomery County, and alleged the commission of the offense with a Mrs. Johnstone on April 15, 1933. It appeared from the testimony that respondent and her brother had followed libellant on several occasions to Glenside where he went for choir practice. Mrs. Johnstone was a member of the same choir. On March 11, 1932, respondent and her brother saw libellant and Mrs. Johnstone board a trolley car. Subsequently respondent and her brother with several friends made a number of visits to Glenside where Mrs. Johnstone lived, to investigate the movements of libellant and his association with Mrs. Johnstone. George Lehr testified

to having watched the latter's apartment on several nights from six to twelve o'clock, the others sitting in the automobile parked on Easton Road in front of the apartment, and they watching and making notes from there. Lehr's testimony recites how he saw libellant and Mrs. Johnstone on several occasions leave the apartment, go to the church and return; that libellant on some occasions entered the apartment with a key which he took from his pocket; that libellant was seen about the apartment with his coat off smoking a pipe; that on occasions he saw no lights in front or rear rooms for some period of time; the watchers from the front testified to practically the same thing. Lehr further testified that on the occasion of one of libellant's visits he saw Mrs. Johnstone clad in thin pajamas and a kimona when she stepped outside to post a letter immediately following libellant's departure. Libellant admitted that he called on Mrs. Johnstone once or twice a week during the month of April and sometimes on Sundays; that he occasionally took his meals there and on such occasions would afterwards empty the garbage and wipe the dishes for his friend. It appeared that Mrs. Johnstone had been separated from her husband for some time and was suing him for a divorce. Libellant claimed that when he was arrested and taken to the office of the justice of the peace, the respondent attempted to interfere with her husband in endeavoring to 'phone for bail. Respondent denied this and was corroborated by her brother, George Lehr, by her sister-in-law, Eva Katherine Lehr, by her friend, Mrs. Lillian Charb, a social worker, and by the justice of the peace himself. Libellant was imprisoned on May 6, until he procured bail the following afternoon. On the evening of May 9, the date of the hearing, it was continued after the taking of testimony of four witnesses for the prosecution. On June 20th, the date set for a final hearing,

the case was again continued until September 29th on which date neither respondent nor any witnesses were present to testify against the libellant and he was discharged. Lehr, the prosecutor endeavored to explain his failure to appear at the hearing by saying that he did not know the time of it. He did however appear with the respondent and her son after the case was disposed of.

Libellant denied any improper relations with Mrs. Johnstone, denied that he had a key for her apartment and denied that he unlocked the door at any time except when Mrs. Johnstone handed the key to him when he accompanied her to her home; that his associations with Mrs. Johnstone were only in connection with their services in the choir; he denied that the lights were ever extinguished in the apartment during any of his visits.

Miss Adaline Wiggins, who lived with Mrs. Johnstone, corroborated libellant and further testified that she and not Mrs. Johnstone wore the pajamas and kimona to which reference has been made; she testified that she did not know whether the libellant had a key to the apartment or not.

Mrs. Johnstone, called by libellant, corroborated the latter in the matters testified to by libellant and denied any improper relations.

While the information was made by respondent's brother, and there is no testimony that it was done at her suggestion, yet we have no doubt that she approved of it and aided in the subsequent pursuit of it. We do not think, however, that it is necessary for us to find any facts or draw any inferences from the testimony taken on the re-reference as it all relates to matters occurring after the libel was filed, and after the filing of the first report of the master. The libel was not based on any of these facts nor did they influence libellant. We do not think that this testimony

was relevant or admissible in support of the charges in the libel or in the bill of particulars. A similar question arose in the case of Realf v. Realf, 77 Pa. 31. That was a libel for divorce for adultery. On demand for specifications, the libellant specified adultery with one individual named, "in the months of February, March and April, 1872, in the City of Pittsburgh; exact time and place unknown," and "visiting in August and September, 1871, the house of ill-fame of A., in Virgin Alley, Pittsburgh, for the purpose of fornication with divers persons unknown by your petitioner." It was held, in an opinion by Mr. Justice GORDON that evidence of improper intimacy with other men and at other times and places than those mentioned in the specifications, not admissible. Quoting from that opinion on page 33: "In Hancock's Appeal, 14 P. F. Smith 470, as well as in the case of Breinig v. Breinig, 2 Casey 161, it was held that if the libel sets forth generally the causes of the libellant's complaint, though unaccompanied by the particulars of time, place, &c., it is sufficient to satisfy the requirements of the act of assembly, and if the respondent requires anything more specific, he or she should demand of the libellant a specification of the particulars intended to be proved. That which is wanting in the petition may thus be supplied and the respondent fully informed of what he or she may be called upon to meet. This rule is so obviously just and proper that courts should not hesitate to enforce it strictly. In the case in hand the libellant was required to file a specification setting forth *inter alia* the names of the persons with whom the alleged adultery was committed, together with the dates and places. ...... The court however permitted the libellant to go out of his specifications, and prove intimacy with other men, and at other times than those set forth and in this manner to carry his case with the

jury. This was a violation of the wholesome rule above referred to, and for this cause the proceedings must be reversed.''

We may therefore eliminate any consideration of the testimony taken on the re-reference, so far as bearing on the findings in the first report of the master. As stated in Langeland v. Langeland, 108 Pa. Superior Ct. 375, 164 A. 816, in a divorce proceeding the master's report is entitled to the fullest consideration because of his personal contact with the witnesses, but it is the duty of the court to make its own independent and careful investigation of the evidence to ascertain whether it does in truth establish a legal cause for divorce.

An examination and careful reading of the voluminous record indicates that libellant was the only witness called on his own behalf to establish the matters alleged in the bill of particulars. If the testimony of the libellant were accepted and that offered against him were rejected, he would be entitled to a divorce, but in many essentials his evidence is not corroborated while respondent's is. The weight of the evidence is with her. On one occasion he claimed that his wife attempted to strike him with a frying pan in the presence of a neighbor but he warded off the blow with his hand. He failed however to call the neighbor. At another time she berated him in a public bowling alley where he had gone with his brother-in-law and his son, but neither of these witnesses were produced to corroborate him. In regard to the dish breaking episodes which he stated occurred on four or five occasions in two-and-one-half years, he did not know the approximate times nor does he charge that his wife threw these dishes at him or even hit him with them. He complained that his wife's relatives used his charge accounts without his permission, but at the same time, he testified he never objected. And

he further assumed that his wife was subsequently compensated for the value of the things so purchased. He also testified that his wife refused to have any more children after the first. Apparently this was the desire of both parties for libellant bought the suppositories which respondent used. Quite frequently intercourse followed the various quarrels, which would seem to indicate the quarrels were not of a serious character. Respondent's alleged jealousy is no doubt explained by the fact that libellant spent three or four nights a week at public dance halls for the purpose, as he said, of "dancing with anybody at all." He admitted that he knew a Mrs. Sittig and was frequently out with her in conveyances and in an automobile. He first met her in a public dance hall when she was married and living with her husband who was a professor and taught school at night. It appeared that he was in the habit of meeting her by appointment, notwithstanding that respondent threatened to tell Mrs. Sittig's husband. It appears that respondent did inform Mr. Sittig, as a result of which libellant met Mrs. Sittig by appointment and both were seated in her automobile at 58th Street and Angora Terrace, Philadelphia, whence they had driven after having met at 46th and Market Streets, Philadelphia. Here Mr. Sittig discovered them. Mr. Sittig complained to the libellant's supervisors of the Pennsylvania Railroad and libellant was reprimanded. He would escort Mrs. Sittig home from the dance hall and leave her two blocks away from her own door. On the occasion of the automobile episode Wagner met Mrs. Sittig by appointment about 9:15 o'clock in the evening. They were caught by the woman's husband who struck Wagner while he was seated in the automobile. Wagner then jumped out and ran away, because, he says, he wanted to avoid a scene. This occurred between 10 or 10:30 P. M., more than an hour after he had first

496

met her.   He also admits having met a girl in Detroit but he does not know whether or not he posed as a single man as he didn't think she was interested; he also received mail from the Detroit girl.   Although he admitted that he was indulging in the marital relationship with his wife up to a week before he finally left her, he was then contemplating divorce proceedings and discussed such action with a lawyer.

Respondent was called as for cross-examination and counsel for appellee asked her categorically if the various charges her husband made were true and she specifically denied them.   It was also brought out in cross-examination that the only plea respondent ever made to her husband's lodge was in an effort to effect a reconciliation, and this was left uncontradicted.   It also appeared that respondent had mailed a letter to her husband in Detroit which had been returned to her marked "not here," although it had been sent 10 days before his return.   These matters may explain any jealousy alleged to have been manifested by respondent.   No man who seeks his pleasures away from home three or four nights a week at dance halls with women who are strangers, except as he may further cultivate their society, can expect a wife who is contented to live her life within the walls of her home with her child, not to resent such actions.

Respondent specifically denied censoring her husband's 'phone calls or suppressing his mail, or interfering with his church activities; she explained that she couldn't often accompany her husband to church because she had to prepare an early Sunday dinner for a large family; she denied having interfered with her husband's lodge activities, and denied that she made a practice of calling at his place of business, either in person or by 'phone; she stated that she did not accompany her husband on his first business to Washington because he was not very enthusiastic about

taking her; the second time she was not invited, and on the last Washington engagement she joined her husband, taking the child with her, over her husband's objection; she admitted that she objected to her husbank's working all day and playing in bands until late at night, thus losing his rest; she denied that she objected to libellant's dancing with their guests or members of each other's family, but she did strenuously object to public dance halls and dancing with strange women; she denied endeavoring to break up any bowling party and testified that the only time she ever visited the place was to bring their boy, who had accompanied his father, home, as it was after midnight; she denied rifling her husband's pockets, and the only letter she ever opened was the one from the Detroit girl which respondent thought was an "ad." In this letter, which was offered in evidence, the girl berates libellant for concealing from her the fact that he was married and had taken her out under false pretence. She further states that her husband was the advocate of birth control, and not herself, after the birth of the child, and she positively denied restricting intercourse, and testified there was no operation performed until the boy was eight years old.

Dr. Delno E. Kercher, who performed the operation, a witness called by respondent, testified that he was the attending physician at the birth of their child, and was called upon in the fall of 1927 to perform an operation on the respondent for a prolapsed uterus for the purpose of restoring her to normal health; that the ovaries were not removed, and as a result of the operation, she was better able to bear children. This refuted libellant's contention that this operation was performed for the purpose of making the respondent sterile. Libellant objected to this operation and refused to pay for it, although she had discussed it with her husband and explained that the doctor said

it was necessary. Respondent denied that she ever threw a frying pan at her husband or broke his straw hat; she denied that she ever threatened to kill him, or called him an illegitimate child; she denied that she ever abandoned her home at night and stated that she only went to her next door neighbors for an one-half hour or so after she heard the child's lessons and had put him to bed. She testified that for the last four years her husband never took her out, but he himself went out every night. The testimony disclosed that libellant contemplated for some time leaving his home, and yet the sexual act was indulged in up to and including the night before libellant left. Not a single witness was called by libellant to corroborate any incident to which he testified. On the other hand, respondent contradicted every matter with which libellant charged her. No good purpose can be served by reviewing here all of the evidence in the very voluminous record all of which we have had to read in typewritten form. We have carefully considered it and are convinced that libellant has not made out the clear case required by the law of Pennsylvania and the decisions of our appellate courts, and have come to a conclusion at variance with that of the master and the lower court.

We held in Lomax v. Lomax, 87 Pa. Superior Ct. 543, that in an action for divorce, it is incumbent on the libellant to establish his case by clear and satisfactory evidence and unless there is this preponderance in his favor, the bill will be dismissed.

Quoting from the opinion by LINN, J., in Twaddell v. Twaddell, 95 Pa. Superior Ct. 429, 432, "The rule of law to be applied is well settled; it is only in cases clearly within the statute that a divorce may be granted; for that reason (when there is no jury trial) the evidence must bear the scrutiny of a master, and then of the common pleas, and then of this court, if an

appeal be taken. 'In a proceeding dissolving a marriage contract, the case is not to be disposed of on a doubtful balance of the evidence nor upon unsubstantial inferences. There must be a presentation of a clear and satisfactory case on which the determination of the court may be confidently rested, and one who would win a case of this character must be clear of everything which is charged as a cause of separation against the opposite party; Edmond's Appeal, 57 Pa. 232; Angier v. Angier, 63 Pa. 450. A decree may be supported by the testimony of the complainant alone, but if this testimony be contradicted and shaken by the respondent and there be no convincing circumstances warranting a disregard of the contradictory evidence, a case has not been made out.' Rommel v. Rommel, 87 Pa. Superior Ct. 511, 513; see also Greims v. Greims, 87 Pa. Superior Ct. 312, 317; Lomax v. Lomax, 87 Pa. Superior Ct. 543; Stewart v. Stewart, 88 Pa. Superior Ct. 1; Headland v. Headland, 88 Pa. Superior Ct. 417; Goldberg v. Goldberg, 89 Pa. Superior Ct. 319; Nacrelli v. Nacrelli, supra.''

In Esenwein v. Esenwein, 105 Pa. Superior Ct. 261, 263, we held in an opinion by our President Judge TREXLER, that in an action for divorce, based on charges similar to those in the instant case, ''that the testimony of the husband, denied and contradicted by the wife (as in this case) cannot be regarded as creating more than a doubtful balance of evidence. When such a situation occurs the libellant fails to make out a clear and satisfactory case: McGowan v. McGowan, 98 Pa. Superior Ct. 194; Twaddell v. Twaddell, 95 Pa. Superior Ct. 429; Dunlap v. Dunlap, 97 Pa. Superior Ct. 405.'' This case was, on appeal, affirmed by the Supreme Court reported in 312 Pa. 77. Further citations are unnecessary to show that the testimony ex parte libellant does not measure up to the required standard. The first and second assignments of error

must therefore be sustained. The remaining assignments of error, relating to the payment of alimony pendente lite, the reduction thereof, and the refusal of additional counsel fees, need not be considered. These matters were all in the discretion of the lower court and we can not say that there was any abuse thereof in the disposition made. These assignments of error are therefore overruled.

Appellee has filed a motion to quash the appeal and assigns in support thereof several reasons and has filed an elaborate brief in support thereof. The alleged defects in the form of the affidavit in taking the appeal, and in the matter of poverty in order to dispense with the giving of security for costs, if such were required in this case, can, if necessary, be cured by an affidavit filed nunc pro tunc. It would be to no purpose to unduly lengthen this opinion beyond its present scope by discussing these reasons in detail. The motion to quash is therefore overruled.

The decree of the lower court is reversed and the record remitted with direction that the libel be dismissed. The appellee to pay the costs.