## Kurtz *v.* Kurtz, Appellant.

Argued October 2, 1936.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*E. P. Curran,* with him *I. Elmer Ecker,* for appellant.

*James C. Furst,* for appellee.

OPINION BY STADTFELD, J., January 29, 1937:

This is a divorce case instituted by the husband and contested by the wife. The libellant seeks a decree in divorce on the ground of desertion. The respondent filed an answer to the libel, in which she denied the charge of the libellant that she deserted him without just or reasonable cause.

The case was heard before a master on October 21, 1935, at Bellefonte, Pennsylvania, where both parties appeared with their witnesses. After hearing, the master filed his report in which he made a recommendation that a decree in divorce be granted. The respondent filed exceptions to the master's report. In an opinion and order, dated February 20, 1936, FLEMING, P. J., dismissed the exceptions and awarded a decree of divorce. Respondent appealed.

We are required, in appeals of this character, to read and consider all of the testimony and form our independent judgment, irrespective of the findings by the master or the conclusions of the lower court: *Langeland v. Langeland,* 108 Pa. Superior Ct. 375, 164 A. 816.

At the time of the marriage on December 9, 1924, the libellant was twenty-one years of age and the respondent nineteen years of age. The libellant was a student in the University of Pittsburgh Dental School. He and

the respondent had been keeping company together from the first time they met in February of 1924, until they were married. Their child, George, was born on March 23, 1926.

The master found, and the testimony supports the finding: "Immediately following their marriage, Libellant and Respondent lived in Pittsburgh until February, 1925, when they moved to Howard, Pa., at which place they resided until September, when Libellant returned to College and they then lived in Pittsburgh until February, 1926, when they again removed to Howard, where they resided until November, 1926, when they returned to Pittsburgh; they remained in Pittsburgh until January, 1927, when Libellant and Respondent separated, the libellant returning to Howard and subsequently obtaining employment with the State Highway Department, and the Respondent remained in Pittsburgh. Respondent came to Howard in November, 1927, because of Libellant's illness, and in March, 1928, they rented a house at Howard in which they resided until July 16, 1928."

Until the final separation in July, 1928, the parties had been married over four years and a half, during which no fixed residence had been established by libellant until March, 1928, four months before the final separation. Their marital life had been intermittently interrupted by frequent separations.

We quote in part from the master's report as correctly summarizing the testimony on behalf of libellant: "On July 4, 1928, Respondent's sister came to visit at Howard and on Saturday evening, July 14, 1928, Libellant testified to an assault committed upon him by Respondent and her sister, and that upon the morning following the assault both Respondent and her sister stated that they were going home to Pittsburgh and not coming back. Whereupon Libellant took his son away from their home and did not return until

Monday morning, at which time he visited the house in company with Clyde Long, who overheard the Respondent state that if her husband wished to see her or their son he must go to Pittsburgh. At this time the Respondent was upstairs packing. Following the departure of Mr. Long the Libellant objected to Respondent leaving, but Respondent left.

"Following her departure Libellant, testified that he maintained his home and notified Respondent, by letter, introduced in evidence as Libellant's Exhibit No. 2, that he would keep their home open for a period of ten (10) days from August 13, 1928. This letter was written following the receipt of Libellant's Exhibit No. 3, dated July 23, 1928, wherein Respondent, without any salutation in the letter, notified Libellant that she had not received the trunk and that 'if it would not inconvenience you (Libellant) in any way' she wished a couple of silk chemises to be sent to her. The trunk in question had been forwarded by Libellant to Respondent on July 26, 1928, as appears by Libellant's Exhibit No. 4. Libellant received no reply to his letter of August 13, 1928, except, as he testifies, to the effect that Respondent knew that the letter was not his letter and she would forgive him for sending it if he would come out and see her.

"Following the departure of Respondent, Libellant testified that he did not live or co-habit with Respondent as husband and wife, although he saw her during the illness of their son."

Libellant is corroborated in his version of the events of July 16, 1928, by Clyde Long, who testifies he overheard the Respondent tell Libellant if Libellant wished to see her or his son, he must come to Pittsburgh.

Mrs. B. S. Kingsley, a sister of Libellant, testified to remarks alleged to have been made by Respondent at various times during the summer of 1928, to the effect

that she didn't like Howard, Pa., and that she was going back to her people in Pittsburgh; that she never, in the hearing of the witness made any effort to come back and live with her husband; that her brother maintained the home for the period of six weeks after the date of the separation in July, 1928.

Dr. Walter J. Kurtz, father of libellant, testified to remarks alleged to have been made by respondent in July, 1928, before she left her husband, to the effect that "she didn't want to live in a dump like Howard. She wanted to get out and see something. No moving picture nor anything. She wouldn't live in a place like that;" that she never said anything that would indicate her willingness to come back and live with Walter; that she never talked to the witness about a reconciliation.

Mr. B. S. Kingsley, who is married to libellant's sister, testified to a statement alleged to have been made by respondent that she didn't care to live in Howard, but he never heard her say that she was going to leave and live in Pittsburgh.

The testimony of respondent is correctly summarized in part by the master as follows: "The Respondent testifies that on the Saturday preceding July 16, 1928, she and her sister, who had come to visit her, had planned to go to Bellefonte 'for the usual beauty treatments, etc.' and that the Libellant was to take them there for such purpose. Because of an engagement of Libellant's father it became impossible for him to drive his wife and sister-in-law to Bellefonte, and he made arrangements for them to be taken to Bellefonte. Upon their return Libellant returned to their home and seemed very angry and canceled a social engagement arranged for that evening, although a bridge game was played in which Libelant took part with Respondent. On Sunday morning Libellant discovered Respondent very early removing two tapestries from a cedar chest.

A scuffle occurred between Libellant and Respondent, each having ends of the tapestries and Libellant was pulling Respondent down the stairs, when in response to Respondent's cries for help, her sister seized her ends of the tapestries and a tug of war ensued, which terminated when Libellant released one tapestry and each was left in possession of one. Libellant then left and shortly thereafter the child of the couple left the house to visit a friend. After Respondent prepared dinner she went to the home where her son was visiting, but did not find him there. She testifies she became very upset and that her inquiries at her father-in-law's home met with a response that it was none of her business. She called her mother in Pittsburgh and received the advice to calm herself. She returned to her father-in-law's home about 7:30 o'clock that evening and got into an altercation with her brother-in-law, who put her out of the house. The next morning she testifies her husband returned, together with their son, George, and that her husband suggested to her that she return to Pittsburgh for a visit because of the animosity which had arisen over this trouble. The Libellant gave her money for the trip and kissed her Good-bye, and expressed regret that this trouble had happened and that he would look for a new home for his family. She admits writing a letter requesting that the trunk be sent home.

"She testifies that after her return home she made several visits to Howard for the purpose of effecting a reconciliation and also testifies that during her husband's return to dental school, when their son was ill with scarlet fever, he visited her home in Pittsburgh to see their son and also just before Christmas in either 1932, or 1933, she co-habited with her husband at his apartment, but is not sure where the apartment is situated."

The testimony of the respondent's sister, Agnes Har-

kins, and mother and father, corroborated respondent as to her trips to Howard, Pa., for the purpose of effecting a reconciliation.

Respondent further testified that on or about August 30, 1934, six years after the alleged separation, she went from Pittsburgh to Howard, Pa., where she stayed over night at the home of the libellant's parents. The libellant and respondent discussed a divorce. "He wanted to divorce me amicably and I told him my reason for my visit was that since he was to be graduated in 1935 and would be in a position to maintain a home for both of us and because of the fact that I loved him dearly, I would not acquiesce to an amicable divorce."

The only evidence to the effect that libellant offered to take respondent back and live with her is a letter written to respondent under date of August 13, 1928, less than a month after libellant had given respondent money to leave town and suggested that she should go back to her people, after he had kissed her good-bye. This letter requested respondent to return to libellant within ten days and was apparently written by counsel and bears the ear-marks of an attempt to lay the grounds for a divorce. In *Musgrave v. Musgrave*, 185 Pa. 260, 39 A. 961, it was held that such a request made by a husband to a wife if entirely formal and upon its face is shown to be made for its legal effect, it is not such a request as is meant by the law. As to the mental attitude of the libellant and expressive of his feelings toward respondent, we have his language in a letter written by him to respondent January 24, 1927 (Respondent's Exhibit No. 1) wherein he states: "You can put George in a home and go to work and probably find someone that will be a good husband to you, then you will never think of me, never remember that I ever existed and you will have happy days whereas all you have had have been sad ones and many of them ......
I think you will be able to see my point of view and

realize that by sticking to me you are only hindering your life, for you are very young yet and it will be just a matter of a few years till you have a much brighter outlook for life."

The rebuttal testimony of libellant makes no denial of respondent's attempts to reconcile matters and establish a home.

From the date of the marriage until their separation on July 16, 1928, due to the inability of the libellant to either earn a sufficient livelihood to support his family or to his inaptitude in his scholastic work at the University of Pittsburgh, no residence was maintained at any one place for a time longer than a few months.

Libellant constantly failed to provide his wife and son with any fixed residence, and he admitted that he has only contributed "possibly to the extent of $300.00 or $350.00 to his son's support" since the marriage.

After a careful reading of the entire testimony, we cannot escape the conclusion that it creates nothing more than a doubtful balance of evidence. When such a situation occurs, the libellant fails to make out a clear and satisfactory case: *McGowan v. McGowan*, 98 Pa. Superior Ct. 194; *Twaddell v. Twaddell*, 95 Pa. Superior Ct. 429; *Dunlap v. Dunlap*, 97 Pa. Superior Ct. 405.

Quoting from *Middleton v. Middleton*, 187 Pa. 612, 41 A. 291, Mr. Justice DEAN said, at p. 615: "Whether the marital contract shall be severed is the gravest of questions, not alone to the parties, but to the state, for the social structure rests upon it. ...... In *Angier v. Angier*, 63 Pa. 450, this language is used: 'Courts ought never to sever the marriage contract but where the application is made in sincerity and truth, for the causes set forth, and no other, and fully sustained by the testimony.' To the same effect are *Jones v. Jones*, 66 Pa. 494, *Edmond's App.*, 57 Pa. 232, *Richards v. Richards*,

37 Pa. 225, *Sower's App.*, 89 Pa. 173, and many others."

As stated in *Wagner v. Wagner*, 112 Pa. Superior Ct., 485, 171 A. 419, at p. 499: "In a proceeding dissolving a marriage contract, the case is not to be disposed of on a doubtful balance of the evidence nor upon unsubstantial inferences. There must be a presentation of a clear and satisfactory case on which the determination of the court may be confidently rested, and one who would win a case of this character must be clear of everything which is charged as a cause of separation against the opposite party: *Edmond's Appeal*, 57 Pa. 232; *Angier v. Angier*, 63 Pa. 450. A decree may be supported by the testimony of the complainant alone, but if this testimony be contradicted and shaken by the respondent and there be no convincing circumstances warranting a disregard of the contradictory evidence, a case has not been made out.' *Rommel v. Rommel*, 87 Pa. Superior Ct. 511, 513; see also *Greims v. Greims*, 87 Pa. Superior Ct. 312, 317; *Lomax v. Lomax*, 87 Pa. Superior Ct. 543; *Stewart v. Stewart*, 88 Pa. Superior Ct. 1; *Headland v. Headland*, 88 Pa. Superior Ct. 417; *Goldberg v. Goldberg*, 89 Pa. Superior Ct. 319; *Nacrelli v. Nacrelli*, supra."

The assignment of error is sustained, decree reversed and the libel dismissed.