Langeland *v.* Langeland, Appellant.

Argued November 21, 1932.

376

Before TREXLER, P. J., KELLER, GAWTHROP, CUNNING-
HAM, BALDRIGE, STADTFELD and PARKER, JJ.

*William G. Schrier,* of *Schrier and Vallilee,* and
with him *Mills and O'Connor,* for appellant.

*W. T. Carey,* and with him, *A. L. Laws,* for appellee.

OPINION BY CUNNINGHAM, J., March 3, 1933:

On September 4, 1930, more than a year after the
approval of "The Divorce Law" of May 2, 1929, P.
L. 1237, Elizabeth Langeland filed her libel in divorce
against Oscar W. Langeland. Although evidently in-
tended to be drawn under clause (f) of section 10 of
that act, its language was not used, but, in accordance
with the former practice, she averred, as the ground
of her petition, that "respondent from the 1st day of
October, 1922, hath offered such indignities to the per-
son of petitioner as to render her condition intolerable
and life burdensome and did thereby force petitioner
to withdraw from respondent's house, home and fam-
ily, on the 15th day of July, 1929."

A bill of particulars was filed; neither party took
a rule for a jury trial and the court below, on motion

of counsel for libellant, made an order referring the case to "Joseph J. Pratt, court stenographer," as a special master to hear the evidence and report his findings. The master recommended a decree in favor of libellant; the court below dismissed respondent's exceptions and entered a final decree on November 28, 1931; this appeal is by the respondent from that decree.

Apart from the merits of the case, it would be our duty to reverse this decree because the procedure in the court below was irregular and the learned president judge thereof did not perform his duties in the manner indicated in numerous appellate decisions— particularly Nacrelli v. Nacrelli, 288 Pa. 1, affirming the decree (87 Pa. Superior Ct. 162) entered in that case by this court.

The person appointed master in this case is not a member of the bar. Section 36, of our present divorce law, provides that the court may "appoint a master to take testimony and return the same to the court," and, by Section 54, it is enacted that where a master has been appointed "he shall make a report to the court of the proceedings had before him, and his opinion of the case." The master's office is a branch of the court, and it is expressly provided in England that the masters of the King's Bench Division must have been practicing barristers, or special pleaders, or solicitors, of five years' standing. Although we seem to have no express statutory provision to the effect that a master in a divorce proceeding must be a member of the bar, it is obvious, in view of the duties assigned him, that one not learned in the law is not competent to act as master.

Indeed, this case is an illustration of at least one good reason for the rule we now announce. The only ground assigned in the libel was indignities to the person of libellant, but the master, after taking nearly two hundred pages of typewritten testimony, filed a

report, covering thirty printed pages, and recommended the granting of the divorce upon two grounds: (a) cruel and barbarous treatment endangering the life of libellant, and (b) indignities to her person rendering her condition intolerable and life burdensome. These are separate and distinct causes for divorce, and there was neither allegation nor proof of any cruel and barbarous treatment in this case. The final decree mentions only indignities to the person, but the court below confirmed the master's report in its entirety, and neither in the opinion nor in the order dismissing the exceptions do we find the slightest reference to the fact that the master had injected into the case a ground for divorce not even pleaded in the libel.

Another difficulty is that it is apparent, from the opinion, that the court below gave undue weight to the conclusions of the master and did not adequately perform its judicial functions.

The parties were married at Athens, Pa., on August 26, 1922; they have two surviving children, William E., born July 5, 1923, and Virginia L., February 16, 1929. The bill of particulars charged that respondent, within two months after their marriage, began a course of humiliating and degrading conduct consisting of profane and obscene language directed to libellant, making sport of her religious beliefs and church connections, threatening to accuse her of infidelity, and culminating in the display of a revolver immediately prior to their separation in July, 1929. The testimony was irreconcilably conflicting but all the conflicts therein were resolved by the master in favor of libellant.

The opinion of the court below, after referring to the conflicting character of the testimony and stating that the master had seen and heard the witnesses and knew most of them personally, continued: "If respondent's treatment of his wife was such as she narrated, if he called her the vile names as she testi-

fied, if he conducted himself toward her as she says he did, and as a result of his conduct she was in fear of her life and the safety of her children to the extent that her health failed her and she became in a nervous condition, which she, her mother and her physician say she was, it, in our judgment is sufficient to sustain the allegation in the libel that the respondent offered such indignities to her person as to render her condition intolerable and her life burdensome. Being unwilling to reverse the findings of the master, who met the witnesses, observed them while giving testimony and gave careful consideration to all the testimony as his report shows, when the determination depends upon the credibility of the witnesses, we feel it our duty to confirm his report.''

This language, we think, indicates a misapprehension upon the part of the court below of its duty in divorce cases, as defined in Nacrelli v. Nacrelli, supra. We need not repeat what was so fully considered and carefully stated in that case with respect to the duty, both of the court below and of this court, in such cases.

The authority for the appointment of a master in a divorce proceeding, in which the Commonwealth is always an unnamed third party, never did confer on him powers similar to those of a master in equity, or give his report and findings the force and effect of the findings of such a master. The question in a divorce case is not whether there was evidence to support the findings of the master; it is the duty of the court to make its own independent and careful investigation of the evidence to ascertain whether it does in truth establish a legal cause for divorce. No matter what drudgery may be involved, this judicial function cannot be relinquished or evaded by the appointment of even the most competent master. True, the master's report is entitled to the fullest consideration because of his personal contact with the witnesses, but it does not come into court with any preponderating weight

or authority which must be overcome by the opposing party.

What was said in the Nacrelli case, and the numerous cases reviewed therein, is particularly applicable to this case because when libellant withdrew from their home, with the children, she left a letter, addressed to respondent and reading: "You will see that I have taken the children's things with me. What I said about separation, I meant and until you can prove you are capable of fully supporting us you need not expect us back. I had hoped to see you today and talk it over. You were foolish you didn't listen more carefully the other day for I've thought it over for a long time and I've considered your side as well as mine. Believe me, it isn't easy." The absence of any reference to indignities immediately raises a question as to libellant's sincerity in now charging them.

If we were satisfied there was merit in libellant's application, we would set aside the decree, for the reasons already indicated, and direct that she be afforded an opportunity to present her case before the court below, or a duly qualified master. When a jury trial has not been had, there is imposed upon us the duty of making an independent examination of the evidence to ascertain whether in very truth it establishes the charge contained in the libel. We may not content ourselves with merely ascertaining whether there was sufficient evidence to support the findings of a master, adopted by the court, or the findings of the court below when it has heard the cause itself under Section 36.

Upon such examination of this voluminous record, we are convinced libellant did not leave respondent because of the alleged occurrences recounted in her testimony as indignities, or because, as she now asserts, she was afraid he would harm her or the children, but because of his failure to support her and their children.

The picture presented by the record, as a whole, is that of a young woman of refinement and education leaving a teaching position to marry a forty-five dollar a week, rolling stone, shoe salesman, and repenting at her leisure. She may have been justified in taking her children and returning to the home of her parents (who have contributed materially to her support ever since her marriage), but she has failed to show that she is entitled to a divorce upon the ground of indignities to her person. Even if we should disregard respondent's categorical denial of every charge and accept libellant's testimony at its full face value, she has not made out her case.

From it, we could conclude that he is profane and vulgar and has drifted from one job to another and from city to city, (Canton, Massilon, Newark, and Wooster, Ohio, and back to Athens, Pa.) and never established a residence in Athens, until 1926. During these four years of rapid changes of location, libellant cohabited with him part of the time and lived with her parents the remainder. Although she testified the alleged indignities began shortly after their marriage, her letters to him, as late as the spring of 1926, thank him repeatedly for flowers and money and are couched in the most affectionate terms.

When asked the significance of her reference (in the above quoted letter) to a discussion "about separation," she replied: "When we first discussed it, before we separated, I said that being as much involved in debt as he was, and out of work, and with little children, if we could each work for ourselves and get going and start again, and he agreed." She added that when she left she felt her life was in danger but did not give respondent that, or any other, reason.

Her account of respondent's alleged threats and of the circumstances under which she went home with her father reads: "We had talked previously about separating and trying to establish a basis for ourselves;

he said he would take one child,—I couldn't have them both; and if I attempted to take them both, he would kill us; July 15, 1929, I planned to go up home, and he planned to go away for a few days, and I went upstairs to dress and he came up in the room where I was dressing and went to the drawer, took out the revolver, examined it carefully, unloaded it, reloaded it, put it in his pocket, gave me a look, and went downstairs, prowled back and forth downstairs until I was dressed. When my father was about due to arrive he left the house but came back; well we were ready to go and my father had our things in the car,—Oscar offered to carry them over to the car; then we came up home."

Her testimony, in our opinion, falls short of proof of habitual contumely, studied neglect, intentional incivility, malignant ridicule and manifestation of hate and estrangement, amounting to indignities and rendering the condition of the injured party intolerable. Sharp v. Sharp, 106 Pa. Superior Ct. 33. Moreover, she is seriously contradicted, and respondent corroborated, by apparently disinterested witnesses. Respondent flatly denied the revolver incident; he stated he owned a revolver and usually kept it in the house but loaned it on July 3, 1929, to a friend, Albert Fisk, to shoot blank cartridges on the 4th. Fisk fully corrobated him and stated he did not return it until the following November.

On the question of libellant's real motive in leaving the common home, there was the testimony of her next door neighbor, Mrs. W. E. Daw, to the effect that libellant and respondent lived a normal life, with the exception that libellant "worried about paying her bills"; and that libellant frequently showed her gifts from respondent and never mentioned any lack of consideration or ill treatment upon his part. Referring to the day libellant left, this witness said, "She had a note that she was leaving behind for Oscar, [re-

spondent] and she said that he had not shown the proper responsibility for her and the children; and until he did so, she would not return,—she would come back, as I understood it, when he did assume the proper responsibility.''

Respondent testified he ''was so unaware of the fact she was leaving'' that he ''carried the bag over to the automobile, where her father was waiting to take her home.'' He has remained at their domicile; in addition to a formal offer of reconciliation at one of the hearings, he submitted considerable testimony relative to his efforts, by means of letters and messengers, to induce libellant to return; it need not be discussed, as much of it consisted of self serving declarations. On the charge of habitual use of liquor and narcotics, the weight of the evidence, medical and lay, was with the husband.

We are by no means persuaded respondent has ever fully realized, or honestly endeavored to perform, his obligations as a husband and father, but we are not charged with the duty of apportioning the blame for this unfortunate matrimonial venture. Our independent conclusion, from all the evidence, is that libellant has not established any legal grounds for a divorce from respondent and we, accordingly, sustain the first and second assignments of error.

The decree is reversed and the record remitted with instructions to dismiss the libel.