## Strathern *v.* Strathern, Appellant.

480

Argued May 7, 1935.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Frederic W. Miller,* for appellant.

*Elverton H. Wicks,* for appellee.

OPINION BY STADTFELD, J., July 18, 1935:

This is an appeal by respondent from a decree in divorce awarded by the lower court on the ground of

wilful and malicious desertion. The libel charges cruel and barbarous treatment, indignities to the person, and desertion. The lower court, GARDNER, J., found that there was no evidence, or not sufficient evidence, to sustain the first two charges, but found that the libellant had established a ground for divorce for wilful and malicious desertion.

In this case, it is incumbent upon us to examine the evidence de novo, and determine whether the court below reached a correct conclusion: Mathias v. Mathias, 114 Pa. Superior Ct. 444, 174 A. 821; Nacrelli v. Nacrelli, 288 Pa. 1, 136 A. 228; Esenwein v. Esenwein, 312 Pa. 77, 167 A. 350; Langeland v. Langeland, 108 Pa. Superior Ct. 375, 164 A. 816.

Libellant and respondent were married September 12, 1905. For many years prior to 1931, libellant was in the hardware business, and for several years up until 1928 the respondent worked on the books in libellant's store, for which service he paid her $25 per week, from which she was supposed to pay certain of the household bills. The libellant paid the rent and testified that he also paid certain meat and grocery bills. For several years prior to December 1931, the relations between the libellant and respondent had been strained and they had not lived together as husband and wife. In July 1931, respondent filed a bill in equity at No. 568 October Term, 1931, against libellant, to obtain specific performance of an alleged ante-nuptial agreement with him. In this bill she alleged that there had been an ante-nuptial agreement whereby all property subsequently owned by him was to be divided equally between them upon her request. This equity case came on for hearing before MARSHALL, (E. W.) J., as chancellor, and was dismissed. The record in that case, including the chancellor's adjudication, was offered in evidence in the present case, and the chancellor made the following findings of fact: "7. Throughout their married life, defendant from time to time put aside

monies in a savings account in the names of his wife and himself, for the purpose of accumulating a fund with which to buy a home. In 1924 the parties desired to remove $5000 of these monies to another bank, whereupon such amount was withdrawn, and without defendant's knowledge or consent, deposited by plaintiff in a savings account which she opened in her own name. Since that time she has expended a considerable portion of such deposit for her personal use.

"8. Defendant had also invested a portion of his earnings in Liberty bonds and war savings stamps, which were kept in a safe deposit box to which each of the parties had access. A few years ago plaintiff extracted therefrom, without her husband's knowledge, bonds and stamps to the value of at least $3000, and appropriated them to her own use."

Since about 1928, when the husband learned of this conduct on the part of his wife, he has not paid her anything except through an order of the County Court, entered July 22, 1932, where she had brought a charge of desertion and non support. The equity case was tried in Common Pleas Court on December 7 and 8, 1931. Libellant testified that his wife never returned to their common domicile in Turtle Creek after December 8, the last day of the equity trial. In this he was corroborated by his mother and sister who lived upstairs in the same building as the libellant and respondent.

Libellant's mother testified that after that date she looked after his apartment and did what housework was necessary therein.

On or about April 29, 1932, respondent returned to the home, took away all her clothes and later returned with a truck and removed most of the furniture from the apartment by taking it through the window. In regard to the removal of the furniture, we quote from the testimony of libellant's mother as follows: "Q. After you talked to her, what took place? A. Well, she gave

her sister-in-law the clothes to carry out to the car in front. I supposed they were going then, and I went upstairs to my work. I was busy. Then I heard something that sounded like somebody walking on the bare floor downstairs, and I said, 'That does sound like downstairs,' so I went down—well, I went into the dining room and looked out of the window and there was a truck and it had some carpets and two lamps and a picture. Then I went downstairs and went around to the window and there they were putting the desk out, the secretary. Q. Out of where? A. Out of the window of the dining room downstairs in their apartment. Q. Where your son lived? A. Yes, sir. I put my hands on it to push it back and then the man that was in the truck came and pushed me aside and took hold of it. I thought it would fall down, you know. They got hold of it and took it." Since the removal of the furniture, respondent never returned to the common domicile, nor cohabited with her husband.

Respondent denied that she had left her husband's home on December 8, 1931, but had remained there off and on until February, 1932. The witnesses on behalf of respondent were not very convincing in their testimony. She testified that in February she had fallen and broken her arm and had gone to her mother's home where she could receive some attention to her broken arm. She did not inform her husband of this accident. She claims that she told her brother to notify her husband and the brother told a mutual friend to notify libellant's mother. Libellant testified that he received no word whatever to this effect. Respondent further testified that in April she had gone back to clean up the house preparatory to resuming marital relations with her husband, when she found the locks on the door changed, whereupon she procured a truck and had the furniture, part of which, she admitted, belonged to her husband, removed through a window. Respondent admitted that libellant's mother told her

that her husband had the keys, but instead of requesting the keys of the libellant to get out the furniture, she moved it out through the window. Libellant had no way of knowing when or if respondent would return to the apartment. The respondent if she had returned, or intended to return in good faith, could easily have gone to libellant's store to see him, or she could have telephoned him and told him that she was returning. Her failure to notify him in any way of her alleged intention to return is a very convincing circumstance that she had no intention of returning to him as his wife, and that her only purpose in returning to their home in April 1932, was to get out the balance of her clothes and to take out the furniture. Respondent admitted that after leaving libellant's home she never told libellant she wished to return and live with him.

Appellant assigns as error the admission of the record in the equity case at No. 568 October Term, 1931. While this record in itself would not establish desertion, it is very illuminating, considering the strained relations theretofore existing, and her departure immediately after the conclusion of the hearing in that case, and the subsequent removal of the furniture, as disclosing her motive in leaving.

The mere fact that she obtained an order in the County Court on the libellant for desertion and non support would not be controlling, nor prevent him from securing a divorce on the ground of desertion upon proper cause shown: Hirsch v. Hirsch, 70 Pa. Superior Ct. 583.

After a careful examination of the entire testimony, we are all convinced that the same establishes a wilful and malicious desertion persisted in for two years and upwards, and that the lower court properly entered a decree in favor of libellant.

The assignments of error are overruled and the decree of the lower court affirmed.