Wiley *v.* Wiley, Appellant.

Argued November 19, 1936.

Before Keller, P. J., Cunningham, Baldrige, Stadtfeld, Parker, James and Rhodes, JJ.

*John V. Horan,* for appellant.

*Edward E. Dicker,* for appellee.

Opinion by Stadtfeld, J., February 26, 1937:

This is an action of divorce a. v. m. brought March 3, 1933 by the husband, John K. Wiley, against his wife, Helen Surman Wiley, the grounds for divorce being alleged as cruel and barbarous treatment endangering the life of her husband, and such indignities to the person of the libellant as to render his condition intolerable and life burdensome, and thereby forcing him to withdraw from his house and family.

A bill of particulars was filed by the libellant, and the respondent filed an answer thereto, denying the averments of the libel.

The case was referred to a master, who filed a report recommending that a decree of divorce, a. v. m., be granted on the grounds of cruel and barbarous treatment, and indignities to the person. Respondent's exceptions were overruled and the report of the master was approved, his findings and conclusions being adopted as the findings and conclusions of the court. A final decree in divorce by DAVIS, P. J., was entered May 15, 1936, from which this appeal was taken.

In his libel and bill of particulars, the libellant charges that the respondent (1) accused his son of having stolen a diamond ring given to her by libellant; (2) continually nagged him with reference to the ring; (3) said his whole family were rotten, and that she hated him, and was sorry she married him, and she could have made a better marriage; (4) told his son that he did not know whether libellant was his father; (5) slapped libellant's face and accused him of infidelity with one of her own friends; (6) accused him of having a venereal disease; (7) constantly nagged him and called him opprobrious names; (8) accused him of having made demands for unnatural sexual intercourse. It is our duty, as there was no jury trial, to examine and analyze the record and determine whether the learned court below, who approved the recommendation of the master, reached a correct conclusion concerning the issues involved: *Langeland v. Langeland,* 108 Pa. Superior Ct. 375, 164 A. 816; *Wagner v. Wagner,* 112 Pa. Superior Ct. 485, 171 A. 419; *Lyons v. Lyons,* 116 Pa. Superior Ct. 385, 176 A. 792; *Sloan v. Sloan,* 122 Pa. Superior Ct. 238, 186 A. 219. The report of the master, particularly as regards the credibility of the witnesses, is to be given the fullest consideration, as he has had the advantage of seeing the parties and hearing the testimony. His report, however, is only advisory and not controlling.

The parties were married November 22, 1928, at

which time the libellant was 59 years of age and the respondent 47. Both parties had been married before. Each of the parties to this action had a child by the former marriage. The husband had an adult son, and the wife had an adult daughter. Apparently they lived together in harmony for about two years, after which quarrels arose and recurred more frequently and became more bitter.

A large amount of testimony was taken, the libellant offering the testimony of three witnesses in addition to his own, and the respondent two witnesses in addition to herself.

The son of libellant by his former marriage, was at the time of the marriage between the parties to this proceeding, about thirty years of age. After the parties had been married about two years, the son lost his job at York, Pa., and on the invitation of his father and stepmother, came to Philadelphia and lived with them. During about two years of the two and one-half years that the son made his home with them, he was employed and paid the respondent $8.00 per week for his lodging and board. This money was retained by the respondent and was in addition to the money given weekly by the libellant to respondent to maintain the table. During the son's unemployment, the payments to his stepmother ceased.

One of the most serious quarrels between the parties arose out of appellant's charge that the son had stolen a ring belonging to respondent, of the value of $150.

According to libellant's testimony, after the ring was missed, a thorough search was made for it in the house, a detective having been called in to aid in the search, but the ring was not found.

Respondent immediately started to blame the son with the theft of the ring. This incident occurred February 27, 1932. The next morning, Sunday morning, the son was asked whether he had taken the ring, and

he said "No." He said that the rings, of which the ring in question was one, and had belonged to his own mother while she was living, had been lying around when his mother was living, and he would not have touched them then and would not now. Another search was then made through the house and the ring was found by libellant in a candy dish on a small buffet in the dining room among a lot of paper clippings. Libellant testified: "A. She kept saying my son was a thief and called me a son-of-a-bitch for upholding him and threw things around the kitchen ...... the kitchen dishes ...... and said she was tired of it and that she was not going to have this thing go on and that she was sure he was the thief." Thereafter there were frequent quarrels which became more numerous from time to time until the separation of the parties on February 15, 1932.

Libellant testified that respondent continually nagged him at the breakfast table and when he came home, also in the presence of his son and in the presence of his grand-niece, Mrs. Cadden. Mrs. Cadden spent weekends with the family and up to the incident of the ring, the relations between her and respondent were very friendly. Respondent always kept saying that libellant's son had stolen the ring and that Mrs. Cadden had seen him throw that ring back on the buffet. On one occasion when Mrs. Cadden had come to spend the night there, the son asked her whether she had seen him throw that ring on the buffet, to which she replied that she had not. This precipitated a bitter argument between respondent and libellant and Mrs. Cadden. Libellant testified that respondent called Mrs. Cadden and the libellant vile and opprobrious names and said to libellant's son, in Mrs. Cadden's presence, that the son was an illegitimate child. "She started in then with cursing everyone of us. Then she went upstairs and screamed and yelled, you could have heard her

down at the corner, and she took a wrist watch that I had given her—a diamond wrist watch—and she threw it across the room and hit the headboard of the bed and smashed it in three or four pieces, saying that she didn't want a damn thing I gave her and that she was tired of it all."

This is corroborated by the son and Mrs. Cadden. Appellant does not say that she did not make the statement concerning the son's parentage. In answer to the question whether she had made such a statement, respondent said: "I don't remember ever saying that."

On many occasions, appellee testified he came home and found his wife out; for over a month from April to May, 1932, she would cook nothing and he had to take his meals in a restaurant. On one occasion, according to appellee, appellant slapped his face and tried to kick him and said he was no good. He testified: "We got up in the hall and she started calling me the usual names ...... and all that and she grabbed a hold of me and slapped my face and tore my shirt and attempted to kick me. ...... I tried to quiet her down by going over to the back room and locking the door."

The son was a witness to this scene and came to the father's rescue.

At the time of the above incident, she also accused appellee of having improper relations with one of her own friends and said that appellee had a "low", i. e., venereal disease. Appellant says that the accusation was really a bit of humor apropos of a remark made by the son. She called him a bastard, an old fool and a damn fool in the presence of his son and Mrs. Cadden.

Because the husband refused to deed the home and transfer the automobile to her, appellee said he was called vile and opprobrious names. She admits that she made the request as to the real estate but said it

was only to "protect" the appellee because his son was running up bills.

On May 22, 1932, appellant's birthday anniversary, appellee wanted appellant to take a trip to New York. Appellee's testimony regarding this trip in part is as follows: "...... and we went on to New York and went to the Hotel Edison. After we got straightened out up there I took her out to dinner and then we went to a theatre. When we came back to the hotel again she started in, she wondered what that son of a bitch of a blond kleptomaniac over home was doing. Q. Referring to whom? A. Referring to my son. Then she started in on myself, that I was no good and that I was too old for her, and all that sort of business ...... Finally it got so bad that I put my hat and coat on and walked out at three o'clock in the morning and walked around on Broadway for hours to quiet my nerves down." On another occasion, on a short trip through New Jersey on the way back, appellant refused to ride with appellee; called him a son-of-a-bitch, and after getting in the car, struck him in the face.

Two scenes in restaurants are related by appellee. The first on June 1, 1932. He had suggested that they eat in town and go to a show. They ate in an Italian restaurant. The wife complained because the restaurant was empty—later that she "had a hell of an evening" and that Wiley wasn't "fit" for her. He slept in a backroom after their return home.

On another occasion at Bahl's restaurant, she created a scene and left the table. Her only explanation before the master was that she was sick, but appellee denied she was ill.

Appellant complained that appellee had spent too much money caring for his first wife during her fatal illness; that if he had spent less then he would have had more to spend on the appellant for a good time: Her answer to this charge is that it wasn't that way.

Her step-son told her his father had spent too much— $31,000—on his mother and so couldn't show his second wife a good time: Appellee also said appellant accused him of killing his first wife and that he wasn't going to kill her.

On another occasion when appellee's mother, an old lady 87 years of age, told appellant that her rings were lying on the buffet, she told appellee that his mother was a liar and a troublemaker and a bitch; appellee told his wife not to use that word for his mother again or he would slap her. She did and he slapped her face.

Appellee's son finally left his father's home on February 3, 1933. In the evening of that day he was coming downstairs intending to go out for the evening. With imprecations, and absolutely without provocation, according to appellee's testimony, the appellant picked up a metal cigarette box, described by the appellee as 9 inches by 4 inches by 3 inches and weighing about two and one-half pounds and hurled it at the son. The father deflected her aim by catching her arm and thereby saved the son a serious injury.

Appellee testified that notwithstanding his son's departure, things weren't any better and she refused to get any food for him or anything else. He testified: "My nerves were going and my business was getting away from me. I could not do anything of any kind; this was on me all the time, so I decided the best thing to do was to get out and leave her the house."

Appellee testified that as a result of the conduct of his wife, his health became affected; he couldn't sleep, do his work or rest and he lost from ten to twelve pounds in weight. In these aspects he is corroborated by his family physician, Dr. Clark I. Thomas, who knew his patient 25 to 30 years and treated him off and on. The doctor definitely said appellee's condition was not due to age but to the nervousness caused by his home life.

Many of the details testified to by appellee were cor-

roborated by Mrs. Mary P. Cadden. She is a grand-niece of Mr. Wiley. During the winter of 1933, she visited his home every week-end as the guest of the parties. She said Mr. Wiley was always friendly, kind and loving towards his wife and she to him until about the middle of December, 1931, when Mrs. Wiley's attitude towards her husband changed. Appellant complained to Mrs. Cadden about cooking meals, that appellee was a "no good son-of-a-bitch and his mother was one, too." Mrs. Cadden further stated that the son's treatment of his step-mother was always polite.

In relation to this witness the master said: "The Master was particularly impressed with Mrs. Mary Cadden, a witness for the Libellant, who confirmed the Libellant's testimony about many of the essential details of his story. Her testimony was given in a simple manner and without displaying any desire to be biased in favor of either party."

He also said: "...... the Master feels it is important to note the testimony of Mrs. Cadden, who was a witness for the Libellant and who impressed the Master as being very frank and truthful and who happened to be a party in the home when the ring was missing."

The particular incidents referred to are only typical of a continuous course of conduct since the incident concerning the ring.

Appellant testified on her own behalf. She admitted many of the causes for irritation which arose between the parties; she confirmed the allegations of the appellee that she was irritable and argumentative, and that she was annoyed with the appellee's son. She did not seriously attempt to defend her conduct or assign any circumstances of extenuation therefore, except that she was undergoing her menopause. There is no medical testimony to corroborate this, although it is strongly urged that since Dr. Thomas was the family physician,

he could have testified in this connection while he was on the stand or later.

She denied having used the epithets stated and says she did not use the language narrated; that *he* called her such things; that *he* was the instigator of the quarrels; that *he* struck her, but always when they were alone, never in the presence of anyone else. She "might have told her husband she hated him in a temper," she said; she admits she called him an old man and that she could have had a better marriage; she admits striking the son; and that her husband did not eat at home and that he went away some week-ends for rest and sleep; she "didn't remember" saying Howard was really a bastard; she admits she wanted the home registered in her name; that appellee was away from home for a week or ten days at a time; that there was the scene at Bahls' Restaurant; that there was constant wrangling and she "might have" called him a damn fool; she also admitted that the appellee threatened to commit suicide after some of their quarrels; and that her step-son's presence in the house until February 3, 1933, was not the cause of trouble: "Q. So Howard's absence from the house at that time (February 3, 1933) had nothing to do with your relationship (with husband)? A. No."

Quoting from the opinion of the lower court: "The libellant's testimony relative to the conduct of the respondent during the time they lived together is corroborated in many details by various witnesses. The respondent denies generally the allegations of the libellant, but presents no worthwhile corroborative proof, and testimony on her behalf confirms libellant's as to her quarrelsome and nagging disposition, as well as her manifest hatred of libellant."

While it is true that the husband admitted slapping his wife, he testified it was after she had reviled his mother three times, and he did not admit he had caused

an injury to her teeth. Her own testimony in that respect is contradictory—at one time she states it was two years before the separation and again, she says it was just before they separated. The dentist is not produced as a witness to corroborate appellant on this point.

The testimony does not warrant appellant's charge in her brief that her husband was frequently intoxicated.

Appellant sought to justify her conduct by alleged provocation from her husband. The testimony on her behalf does not substantiate this defense. Appellee denied the accusations as to demands for unnatural sexual intercourse.

As stated by our Brother CUNNINGHAM in *Sharp v. Sharp,* 106 Pa. Superior Ct., 33, 161 A. 453: "It has been repeatedly stated that 'it is impossible to lay down a general rule for the determination of what indignities render the condition of the injured party intolerable. It has been held by many courts that they consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and estrangement; but slight or irregular acts of misconduct are not sufficient'."

After a careful examination of the entire record, we have come to the conclusion and are of the opinion that the testimony does not support the charges of cruelty but amply justifies and supports the findings as to indignities.

The assignments of error are overruled and the decree of the lower court is affirmed.