Opinion by
 

 Parker, J.,
 

 In this divorce action the court below entered a final decree in favor of the libellant on the ground that the respondent had wilfully and maliciously deserted her husband. That court did not file an opinion but adopted the recommendation of a master, made after findings of fact and a discussion of the facts and law. We have reached a different conclusion and are all of the opinion that the libellant failed to sustain the/ burden that was on him to make out a case by evidence that was clear and satisfactory.
 

 As we are required to do, in the absence of a jury trial
 
 (Sloan v.
 
 Sloan, 122 Pa. Superior Ct. 238, 186 A. 219;
 
 Langeland v. Langeland,
 
 108 Pa. Superior Ct. 375, 164 A. 816), we have carefully read the 460 pages of testimony and reached the independent conclusion that the libellant encouraged and consented to a separation which occurred between the parties and that consequently there was no proof of a “wilful and malicious desertion.”
 

 The libellant, a Protestant, and the respondent, a Roman Catholic, were married by a priest of her church on March 28, 1932, after a courtship of three and one-half years and after they had discussed their differences in religious faith and the libellant had agreed that he would not interfere with the respondent’s religion and would permit any children born to them to be reared in accordance with Roman Catholic faith. One child was born of the marriage on January 16,1933, and was baptized by a Catholic priest. They separated in October, 1933.
 

 The divorce statute provides that an
 
 innocent and injured
 
 spouse may obtain a divorce when the other
 
 *323
 
 spouse “shall have committed wilful and malicious desertion, and absence from the habitation of the injured and innocent spouse, without a reasonable cause, for and during the term and space of two years”: Act of May 2, 1929, P. L. 1237, §10, par. 1(d), (23 PS §10). When separation has been established by evidence the burden shifts to the other party to prove consent or reasonable cause:
 
 Mertz v. Mertz,
 
 119 Pa. Superior Ct. 538, 540, 180 A. 708. “An apparently wilful and malicious intent to desert may be rebutted by evidence that the separation was encouraged by the other party or was by mutual consent.......Mere silent acquiescence, however, is not sufficient to establish consent; there must be shown some affirmative conduct amounting to participation, some evidence of a present mutual intention of the parties to separate and live apart”:
 
 Mertz v. Mertz,
 
 supra, p. 540.
 

 There are a number of important items that are not in dispute and to which both sides assent, and we will first refer to these. There was friction between the parties within three weeks after they were married. The respondent became pregnant within a month after the marriage; she fixes the time as being within two weeks of the marriage. At the end of six weeks the parties separated and respondent went to her mother’s home and libellant to the home of his parents. The respondent made advances looking to a reconciliation and asked the assistance of libellant’s mother. As a result they returned to the common home. There was constant friction between the parties before and after the baby was born, practically all of their controversies centering around attacks made by libellant on the respondent’s religion and his failure to provide sufficient money to furnish necessary food. When they were first married the libellant was earning $43 per week, which sum was later reduced to $39 per week.
 

 The unhappy differences between the parties con
 
 *324
 
 tinued until October 4, 1933, when libellant took respondent and the baby in his automobile to the home of the mother of respondent. Both libellant and respondent had infected fingers just prior to this separation, the libellant being so seriously affected that he was unable to work for two or more weeks. Both parties agree that the separation on October 4, 1933, did not constitute a desertion and, in fact, ¡the libellant does not contend that respondent deserted him until October 24, 1933. Nevertheless, the master found that the desertion took place on October 4.
 

 It would unduly extend this opinion to state in detail the contradictory testimony produced by the respective parties. The testimony of the parties cannot be harmonized as to many important items. In the main, we think that of the wife should be accepted and that of the husband rejected and we will later state our reasons for such conclusion. We shall for the present, confine our attention to that portion of the evidence which concerns the requests of the husband that his wife return to their common home and the attitude of the wife with respect to resuming marital relations.
 

 Beginning a few weeks after their marriage the libellant abused the respondent physically and mentally. These occurrences are referred to not for the purpose of showing such barbarous treatment or indignities upon his part as would justify the granting of a divorce upon either ground, — we are not certain they were not in fact sufficient for the purpose, — but as bearing on the good faith of the husband in asking his wife to return, as he alleged he did, and showing affirmative acts on his part deliberately intended to provoke his wife into remaining apart from him. This conduct on his part was exhibited in several respects, by physical abuse, by referring to her religion in an offensive and insulting manner, and in contributing less than was necessary for the sustenance of two adults and a baby.
 
 *325
 
 The libellant struck the respondent on four occasions, at least once and probably twice when she was pregnant, and on one occasion his treatment was such that she “passed out,” as she describes it. He offended her by ridiculing her religion in referring to the priest who had married them as “the Irish, pig that married us,” by saying to, her that he was constantly humiliated among his associates by reason of the fact that the child was baptized in the Catholic .church, although this was done with his consent, and by complaining because she gave from five cents to twenty-five cents a week for the support of her church. At this time he was earning approximately $40 per week and was able to spend $200 on aviation lessons and, after the separation, purchased an airplane. He referred to her church as that “God damned church” and said: “The poor saps that attend the church are led around by their noses.” He on numerous other occasions offended her by slighting remarks about her church. Notwithstanding the income which he had, he limited his wife first to $8 and then to $7 per week for laundry and food and he finally refused to allow her to have the cash to make these scanty purchases because she had contributed that particular week twenty-five cents to her church.
 

 In September, 1933, he suffered an infected finger and was unable to work. The parties went to the home of his wife’s mother where he was nursed and cared for for approximately a week. They returned home and the wife’s finger became infected so that she was unable to do the washing for the baby. By mutual consent on October 4,1933, he took her to her mother's home while he went on a fishing trip or other excursion.. Neither of them was well at this particular time and while they had been having some disagreements by reason of his conduct the arrangement for the change was by mutual consent, as is shown by testimony of both libellant and respondent.
 

 
 *326
 
 As we have indicated, the libellant, the respondent, and their baby went to the home of respondent’s mother on October 4, 1933. That evening libellant took respondent and two friends to a picture theatre and after-wards to a tap room. They returned to the mother’s home where he remained about an hour. When he was ready to leave she asked him if he wasn’t going to kiss her goodnight. He sneered and walked out. The next day he brought the baby carriage to her but nothing of importance occurred. After a short vacation he went to the home of his mother. The libellant testified that within a month, on a number of occasions, he urged his wife to return to the common home and that she refused. The testimony of the wife, which we accept, presents his alleged requests in a different light.
 

 Libellant did not communicate with his wife until the evening of October 9 when he called her by telephone and asked her if she was coming home. It will be noted that although he had an automobile he did not go to the house for his wife or offer to come and get her. In reply to his inquiry she asked him whether he would stop arguing about religion and give her enough money to run the house. To this he answered: “Mary, whether you stay where you are or whether you come home with me is entirely up to yourself, but get this: I am not coaxing you.” When he again asked her whether she was coming back she replied, “Bert, that depends on you; I am willing to come back with you if you give me some money and stop arguing about religion, but we cannot go on as we have been.” He then said: “I am not making any promises to you, Mary.”
 

 About three weeks later he again called her on the telephone, not having visited her personally, and said: “I am going to put my things in storage, and how about putting your things in storage with mine?” She replied: “No, don’t do that; you can put your things in storage if you want to but leave my things where they are.”
 
 *327
 
 On November 11, Mr. and Mrs. Harmstead, mutual friends, invited the parties to take dinner with them at their home with a hope of promoting a reconciliation. The respondent accepted the invitation and went to the home at the time appointed but the husband did not arrive until about an hour later. They had dinner there and during that time the libellant directed no conversation to his wife. After the evening meal, Mr. and Mrs. Harmstead left them alone. Libellant did not speak to his wife or break the silence for some time, when she took the baby and placed it on his lap and he still remained uncommunicative. When the time arrived to leave, Mr. Harmstead suggested that the libellant take Harmstead’s car and drive his wife home. While they were going home the husband asked his wife: “Are you washed up?” She replied: “Yes, I am, Bert, unless you promise me that you will do different and give me the money and stop arguing religion.” As she was getting out of the car she said: “Bert, don’t you want to kiss me goodbye?” He then kissed the baby and said to his wife: “You ought to have your ass kicked.” He did not kiss her goodnight.
 

 About November 13, he called his wife and told her that he was disposing of the household goods and giving up the lease and she would have to come up and get her goods. She ¡went to the house on November 14 and when she got there displayed some emotion which caused him to say: “It is too late to feel that way now. You know it is going to cost something to keep the baby and I am willing to buy the baby’s milk.” As a matter of fact he did not do so or make any contributions except a few small items of no importance, these consisting of about three dollars’ worth of garments for the child. He next called her on the telephone on December 7 and asked what it would cost to get a high chair for the baby for Christmas. She told him that it would cost about four dollars and he sent that money
 
 *328
 
 for the chair. At this time he again said to his wife: “Mary, don’t expect me to stay home with my thumbs crossed, because I am not going to do it. On the other hand, I don’t expect' you to do it either.” He said nothing about a reconciliation.
 

 After this time libellant spent considerable time showing attention to an unmarried girl. Mrs. Irwin called at .the home of this girl with a view td having' her break up her friendly relations with the libellant. When libellant discovered this he called his wife at one o’clock in the morning and' said: “I don’t want you annoying them [the parents of the young lady], and, furthermore, I was washed up with you the day we separated, and I don’t want to even go where you are.” When the wife reminded him that the young lady with whom he was keeping company 'was a Catholic and could not marry him, he said: “She felt that way at the beginning but she doesn’t feel that way now. If I were free to marry her she would go to a justice of the peace with me tomorrow.” After this talk on the telephone respondent had libellant arrested for desertion and nonsupport and the court made her an allowance.
 

 Libellant also claims that when in court on one hearing with relation to support he asked her to come back to him. We quote his own testimony at the hearing in the municipal court : “Q. Are you willing to take her back now? A. If she wants to come back, let her come.”
 

 We have cited the testimony of the wife and relied upon it and the testimony of her witnesses for the most part for the reason that the testimony of the libellant was inaccurate and in many cases exaggerated. He made numerous general and self-serving statements which he could not substantiate on cross-examination and some of which were contradicted by disinterested witnesses. As an example, we refer to his statement that he could not contribute more than he had to household expenses because he was using all his money to
 
 *329
 
 pay for furniture, rent, and the like. On cross-examination it was brought out that beginning August 21,1933, he took a course in flying and spent; $200 for these lessons and that shortly after the separation he purchased an airplane. We also refer to his testimony as to the amount of insurance carried, the meeting at the home of Mr. Harmstead, and the circumstances under' which they left their home on October 4, 1933. On the other hand, the testimony of the wife was specific and candid even when admissions were against her.
 

 We are of the opinion! that the libellant failed to show a wilful and malicious desertion and, in addition, that the respondent has shown that the separation was not only acquiesced in but promoted by the libellant. It is beyond question that the separation on October 4, 1933, was by mutual consent and that thereafter he not only acquiesced in the separation but did all that he could to provoke its continuance. A separation does not become wilful and malicious desertion on the part of one spouse where the other consents to or encourages the separation:
 
 Ingersoll v. Ingersoll,
 
 49 Pa. 249, 251;
 
 Neagley v. Neagley,
 
 59 Pa. Superior Ct. 565, 571;
 
 Alexander v. Alexander,
 
 100 Pa. Superior Ct. 566;
 
 Heikes v. Heikes,
 
 90 Pa. Superior Ct. 312, 317;
 
 Hill v. Hill,
 
 96 Pa. Superior Ct. 410, 414. ;To constitute a ground for divorce the desertion must be continued for two years, during which time even an offending party may end the intended desertion by pursuing a proper course:
 
 Winner v. Winner,
 
 122 Pa. Superior Ct. 382, 186 A. 245. Within such time libellant said to his wife: “I was washed up with you the day we separated, and I don’t want to even go where you are.” In other words the libellant closed the door to respondent. This he did not have a right to do during that period.
 

 It is not open to argument that the separation of October 4 did not constitute such a desertion as will support a decree in divorce. When we consider the
 
 *330
 
 conduct of libellant toward Ms wife in provoking unhappy differences while they were in their home, by wounding her feelings and abusing her physically, all within a few months of their marriage, and then analyze his alleged offers to renew the marriage relations, we cannot but conclude that such offers were mere idle gestures made for the purpose of providing evidence and not made in good faith. His requests, or rather inquiries, were phrased so that the wife would not return. The moment the libellant had his wife in her mother’s home his actions were further designed to provoke a continued separation and prevent a return. This is not a case of mere silent acquiescence upon the part of the husband. The conduct of the libellant shows clearly that the continued separation was what he desired and was endeavoring to bring about. Such facts are not sufficient to establish a wilful and malicious desertion, and in such circumstances the libellant is not an innocent and injured spouse.
 

 Decree reversed at the cost of the appellee.